(39 P.3d 675)

No. 86,859

CATHERINE ESTRADA RODARTE, *Appellant/Cross-appellee,* v. KANSAS DEPARTMENT OF TRANSPORTATION, *Defendant,* STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, *Appellee/ Cross-appellant,* and ASHLAND, INC., and ASHLAND-WARREN, INC., *Appellees.*

Opinion filed February 1, 2002.

*Steven A. Ediger,* of Kansas City, Missouri, for appellant/cross-appellee.

*Michael J. Dutton,* of Wallace, Saunders, Austin, Brown & Enochs, Chtd., of Overland Park, for appellee/cross-appellant.

*Thomas L. Griswold, Donald R. Whitney,* and *Michael B. Lowe,* of Payne & Jones, Chtd., of Overland Park, for appellees.

Before RULON, C.J., JOHNSON, J., and ROGG, S.J.

JOHNSON, J.: Catherine Estrada Rodarte sustained serious injuries when she drove a vehicle off the highway and struck a guardrail. Proceeding on the theory that a phantom motorist caused the accident, Rodarte filed this lawsuit against her insurer, State Farm

Mutual Automobile Insurance Company, under her policy's uninsured motorist (UM) coverage. Rodarte also claimed the guardrail was improperly constructed and included the Kansas Department of Transportation (KDOT), Ashland-Warren, Inc., and Ashland Oil, Inc. as defendants. Rodarte settled with KDOT. The district court granted Ashland's motion for summary judgment on the guardrail issue, but Rodarte's UM claim proceeded to jury trial. The jury found neither Rodarte nor the phantom driver at fault; Rodarte's UM claim failed. Rodarte appeals the trial court's granting of summary judgment and the trial court's instructions to the jury. State Farm cross-appeals, challenging the district court's denial of its second motion for summary judgment, its motion in limine, and its motion for directed verdict. We affirm.

## UNINSURED MOTORIST CLAIM

*Facts*

The accident occurred on April 9, 1996, during morning rush hour, as Rodarte was northbound on U.S. Highway 69 (US 69) in Johnson County. There were three witnesses to the accident, each giving slightly different versions of the events.

James Bell noticed Rodarte's vehicle when it was in front of him in the center lane of traffic on US 69. Bell saw Rodarte's car turn sharply across the left lane and into the median. Rodarte then hit the guardrail, and the vehicle flipped upside down. Bell did not see another vehicle do anything that would have caused Rodarte to steer into the left lane and into the median. Bell, however, believed that another car struck Rodarte's vehicle because it turned so sharply and left the roadway at nearly a right angle.

Janice Schnuelle was driving in the left lane of traffic. Schnuelle claimed that she saw Rodarte's vehicle speed past her in the center lane, then apply her brakes and move into the left lane, in front of the car ahead of Schnuelle. The next thing Schnuelle remembered was Rodarte going into the median. Schnuelle believed Rodarte braked because she was coming upon slower moving traffic. Schnuelle testified that she did not see any vehicle cut in front of Rodarte.

Kelly Kellerman was driving in the left lane, directly behind Schnuelle. Kellerman first noticed Rodarte's car when it was in the left lane, a few cars ahead of Kellerman. Kellerman, however, claimed that she saw another car merge into the middle lane, causing two other cars in that lane to stop. That car then moved into the left lane, again causing traffic to stop. Kellerman did not see the driver of that car use a turn signal when changing lanes. When the vehicle went into the left lane, the phantom motorist slammed on the brakes. Kellerman could not give a description of this car or say whether this car merged directly in front of Rodarte or in front of a different car. This caused the other vehicles in the left lane to brake. Kellerman had to steer to the left shoulder to avoid hitting Schnuelle. Before swerving onto the shoulder, however, Kellerman saw Rodarte apply her brakes and lose control of her vehicle.

*Failure to Give Jury Instructions*

Rodarte asserts the district court erred in failing to instruct the jury as she had requested. The trial court is required to properly instruct the jury on a party's theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole. Where the instructions fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and the jury could not reasonably have been misled by them, the instructions will be approved on appeal. *Wood v. Groh*, 269 Kan. 420, 423-24, 7 P.3d 1163 (2000).

The jury was instructed on the issues in the following manner:

"The plaintiff, Catherine Estrada Rodarte, claims that she sustained injuries and damages due to the fault of a phantom driver. The plaintiff claims the phantom driver was negligent in the following respects:

"1. Failed to turn its vehicle to the left unless the movement could be done with reasonable safety.

"2. Failed to use ordinary care in keeping its vehicle under control and driving within his or her range of vision so that it could be slowed, stopped or turned aside to avoid colliding with another vehicle using the highway.

"3. Failed to keep a proper lookout for vehicles which may affect its use of the roadway, including a lookout to the rear, since its movements may have affected the operation of vehicles to the rear.

"The plaintiff has the burden to prove that it is more probably true than not that she sustained injuries and damages caused by any one or more of the claimed negligent acts or omissions of the phantom driver. Agreement as to which specific negligent act or omission is not required.

"Defendant State Farm claims that the plaintiff was at fault in causing this accident and that she was negligent in the operation of her vehicle because she:

"a. Failed to keep a proper lookout;

"b. Failed to keep proper control of her vehicle so as to slow, stop or turn aside to avoid an accident;

"c. Was traveling at a speed in excess of the posted speed limit;

"d. Was traveling at a speed that was not safe and appropriate for the conditions that existed as plaintiff came upon slower moving traffic;

"e. Was following another vehicle more closely than was reasonable for the existing conditions.

"The defendant has the burden to prove its claims of fault on the part of the plaintiff are more probably than not true."

Rodarte appeals the district court's rulings on two of her proposed instructions, which related to a motorist's duty to drive his or her vehicle within a single lane and to signal while changing lanes. PIK Civ. 3d 121.23(a) states:

"The laws of Kansas provide that whenever any roadway has been divided into two or more clearly marked lanes for traffic, a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety."

While the district court did not include this instruction in the "issues" instruction as Rodarte requested, PIK Civ. 3d 121.23 was given to the jury in a separate instruction. Rodarte argues the court's *placement* of this instruction was prejudicial. She contends that because the instruction was not one of the listed acts of negligence from which the jury could choose, the jury would not have understood that the instruction applied to the phantom motorist's actions. We disagree.

Considering the jury instructions together and reading them as a whole, we find the jury could not reasonably have been misled as to its application and the placement of Rodarte's requested in-

struction did not prejudice the presentation of her theory of recovery.

The district court declined to include Rodarte's second requested instruction, PIK Civ. 3d 121.26(a), which states:

"The laws of Kansas provide that no person shall turn a vehicle or move right or left upon a roadway unless and until the movement can be made with reasonable safety. No person shall turn any vehicle without giving an appropriate signal. A signal of intention to turn or move right or left when required shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning."

Rodarte argues that the court's failure to give this instruction was prejudicial because it contains two separate acts of negligence: (1) moving the vehicle to the left without ascertaining it is safe to do so, and (2) failing to signal an intent to change directions.

As State Farm points out, the first part of 121.26 is substantially covered by 121.23. Both instructions discuss essentially the same duty of a motorist to stay in his or her lane until a lane change can be effected with reasonable safety. Error cannot be predicated on the trial court's refusal to give an instruction when its substance is adequately covered in other instructions. *Guillan v. Watts*, 249 Kan. 606, 617, 822 P.2d 582 (1991).

The remaining question is whether the district court erred in failing to give an instruction on the phantom motorist's alleged failure to use his or her turn signal while changing lanes. Witness Kellerman testified that she did not see the phantom motorist use his or her turn signal. However, both Schnuelle and Bell testified that they did not see any phantom motorist. The district court determined that there was not sufficient evidence in the record to support the turn signal instruction. Rodarte argues that, in light of Kellerman's testimony, such an instruction was warranted. State Farm counters that Kellerman's testimony that she did not see the phantom motorist use a turn signal does not necessarily mean that no turn signal was used.

Regardless of whether Kellerman's testimony provided sufficient evidence to justify the district court's inclusion of 121.26 in the jury instructions, it is clear that Rodarte was not prejudiced. The jury was given the opportunity to find negligence based upon the phan-

tom's changing lanes when the movement could not be done with reasonable safety, but declined to do so. Therefore, if the phantom safely changed lanes, his or her failure to signal the lane change would not, standing alone, constitute negligence. *Cf.*, *Every v. Jefferson Ins. Co. of N.Y.*, 4 Kan. App. 2d 715, 718-19, 610 P.2d 645 (1980) (holding unsubstantiated evidence that motorist failed to signal prior to turning could not constitute proximate cause).

The instructions, considered together and read as a whole, fairly instructed the jury on the law governing the case and adequately presented Rodarte's theory of recovery. The jury's verdict is affirmed.

## GUARDRAIL CONSTRUCTION CLAIM

*Facts*

In 1974, Reno Construction Company, Inc., (Reno) was awarded a contract by the State Highway Commission of Kansas (now KDOT) for a project at the accident site that involved mostly surfacing, but included the construction of the guardrails protecting five bridge piers in the median between the northbound and southbound lanes of US 69. Ashland-Warren was a wholly owned subsidiary of Ashland Oil; however, it was dissolved in 1983 and no longer has the capacity to be sued. See K.S.A. 17-6807; *First American Investment Group, Inc. v. Henry*, 11 Kan. App. 2d 671, 675-76, 732 P.2d 792 (1987). Ashland Oil, now known as Ashland, Inc. (Ashland), is the successor in interest to Reno. Tucker Construction of Moran, Inc., was the subcontractor that actually installed the guardrails. The project was completed in 1976, and the work was accepted by the State. Reno had no responsibility for or involvement in the design of the project or its specifications. According to KDOT, the guardrails were constructed in accordance with all applicable plans, drawings and specifications.

Rodarte, however, alleged in her petition that Reno negligently performed its obligations under the contract by failing to install the guardrails in accordance with the contract specifications and by negligently failing to warn KDOT that the guardrail it did install was negligently designed. Rodarte claims a different guardrail design was called for by the contract specifications. She argues that

the design of the guardrails that were installed at the accident site caused her vehicle to become airborne and flip. Rodarte believes the injuries she sustained in the accident are attributable, in part, to the allegedly faulty construction of the guardrails.

A KDOT document entitled "Protective Steel Plate Guard Fence at Bridge Piers" contains the relevant specifications for the guardrails at the accident site. This document is dated September 15, 1970, and the illustrative drawings show the proper design for guardrails at both a single column pier and a 2-column pier. The guardrails depicted are an "open-end" design; that is, the ends of the guardrails on either side of the columns do not connect with one another. Both drawings contemplate a roadway containing a shoulder and a wide unpaved median. The parties agree that the design used at the accident site was the 2-column configuration.

This document was updated in 1972 and included additional specifications for a 6-column pier over a narrow, hard-surfaced, curbed median. This configuration features a "closed-end" guardrail design, in which the guardrails on either side of the columns are joined at both ends, forming a "buffer end section." The drawing contains a note stating, in part: "If any of these conditions vary, the lengths and radii shown can or will vary. The general layout will, however, be used for all conditions."

Rodarte argues that the specifications called for the closed-end guardrail design to be used at the accident site because the overpass contains a multiple-column pier. Reno, however, installed the open-end guardrail as depicted in the 2-column configuration. This discrepancy is the basis for Rodarte's negligence claim against Ashland.

Ashland maintains that Reno fully complied with the contract provisions and specifications. This contention is supported by both KDOT and the affidavit of William M. Lackey, the Assistant Secretary of Transportation and State Transportation Engineer. Lackey was also the division engineer who approved Reno's work for the State in 1976. Ashland points out that the 2-column configuration contains a note reading: "For more than two columns this dimension shall be increased accordingly." Thus, the 2-column design contemplates use with multiple-column piers. Moreover,

Ashland argues that the closed-end design is appropriate where the median is narrow and curbed, whereas, at the accident site, the opposing lanes of traffic were separated by shoulders on both sides and a wide, unpaved median, as depicted in the 2-column design specifications.

Ashland filed a motion for summary judgment on the grounds that it is immune from suit pursuant to K.S.A. 68-419a(a). Ashland claimed the work it performed was accepted by KDOT and conformed with the contract provisions and specifications. Consequently, Ashland argued Rodarte's claim against it is barred.

In her response to Ashland's motion for summary judgment, Rodarte included an affidavit from William H. Wendling, an engineer and expert in the area of guardrail design. After examining the KDOT specifications, Wendling opined that by 1972, the closed-end design would have been required by the State at the accident site. Consequently, despite the State's acceptance of Reno's work, the open-end guardrails did not conform to the contract specifications. The district court, however, found Wendling's affidavit to be too speculative and conclusory to establish a disputed issue of material fact and granted Ashland's motion for summary judgment. Rodarte filed a motion for reconsideration which was denied by the district court.

*Summary Judgment*

Rodarte argues that the district court erred in granting summary judgment in favor of Ashland. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. K.S.A. 2000 Supp. 60-256(c). The trial court must resolve all facts and reasonable inferences in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, the adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. The appellate courts apply the same rules. Where reasonable minds

could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 (1999).

The basis for the district court's decision was that Ashland was immune from suit.

"(a) Whenever any public officer, as defined by K.S.A. 75-4301, shall enter into a contract on behalf of the state or any agency or instrumentality thereof for the construction of any highway or turnpike, in accordance with the laws of this state, the contractor shall not be liable for damages arising out of design defects involving the construction of such highway or turnpike resulting in injury to persons or damage to property, occurring after completion of the contract, and acceptance thereof by such public officer, if the contractor has complied with all contractual provisions and specifications imposed by state and federal agencies with respect to such highway or turnpike. Nothing contained in this section shall be construed as abrogating, limiting or otherwise affecting any cause of action accruing to the state or any agency or instrumentality thereof which was a party to such contract." K.S.A. 68-419a.

Apparently, there is no case law applying the highway contractor immunity statute since its enactment in 1974. However, the plain language of the statute reveals a simple 3-part test. A contractor is immune from liability for damages arising out of design defects involving the construction of a highway or turnpike if: (1) the injury to persons or damage to property occurred after the construction was complete; (2) the contractor's work was accepted by the appropriate public official; and (3) the contractor complied with all contractual provisions and specifications imposed by state and federal agencies with respect to such highway or turnpike. K.S.A. 68-419a(a).

There is no dispute that Rodarte's injuries, sustained in 1996, post-dated the 1976 completion of the construction project. Rodarte has not proffered any evidence to controvert that KDOT accepted the work of Reno and its subcontractors. Ashland established that fact through the Notice of Acceptance, signed by KDOT's field engineer and division engineer (W. M. Lackey), and issued to Reno in August of 1976. The question, then, is whether Reno complied with all contractual provisions and specifications imposed by KDOT.

Neither party has provided an actual contract between the State and Reno that specifically states which guardrail design illustrated on the specifications sheet was to be constructed at the accident site; perhaps none exists. However, the affidavit of the division engineer on the project unequivocally states that "[t]he work of [Reno], and its subcontractors on the project, including the median and guard rail construction work by [Reno], or by its subcontractor [Tucker], was accepted by the State Highway Commission of Kansas and/or the Kansas Department of Transportation as being in compliance with the contract provisions and specifications for the project."

Rodarte asserts the affidavit did not establish the fact that the work conformed with specifications because the affiant was not the field engineer who actually inspected the work and, therefore, his opinion is based upon hearsay. This argument is not persuasive because both the field engineer and the affiant, as division engineer, were required to sign the notice of acceptance issued to Reno. Certainly, the supervising engineer was qualified to testify that KDOT had accepted the work as conforming to the contract terms and specifications.

Rodarte offered the affidavit of her expert, William H. Wendling, which stated the closed end design "[w]as the design which was required to be used at this location (accident scene) and the configuration stated in KDOT's response to Plaintiff's Second Interrogatory was not the correct configuration; and another instance of a Contractor performing work not in accordance with the plans and KDOT accepting the work as completed." Rodarte insists this places in dispute whether KDOT accepted non-conforming work. However, Standard Specification 105.03, Standard Specifications for State Road and Bridge Construction (1973), provides:

"**CONFORMITY WITH THE PLANS AND SPECIFICATIONS**—All work performed and all materials furnished shall be in reasonably close conformity with the lines, grades, cross sections, dimensions, and material requirements, including tolerances, shown on the plans or indicated in the specifications.

"In the event the Engineer finds the materials or the finished product in which the materials are used not within reasonably close conformity with the plans and specifications but that reasonably acceptable work has been produced, he shall then make a determination if the work shall be accepted and remain in place: In

that event, the Engineer will document the basis of acceptance by contract modification which will provide for an appropriate adjustment in the contract price for such work or materials as he deems necessary to conform to his determination based on engineering judgment.

"In the event the Engineer finds the materials or the finished product in which the materials are used or the work performed are not in reasonably close conformity with the plans and specifications and have resulted in an inferior or unsatisfactory product, the work or materials shall be removed and replaced or otherwise corrected by and at the expense of the Contractor."

KDOT's notice of acceptance issued to Reno, as reflected in the record, does not indicate that the basis of acceptance was pursuant to a contract modification. Rodarte proffers no other evidence that the engineer documented a nonconforming acceptance.

Rodarte failed to establish a material factual dispute with respect to Reno's compliance with the relevant contractual provisions and specifications. Specifically, she presented no evidence that Reno installed the 2-column design in contravention of its agreement with the State. While the Wendling affidavit calls into question which plans KDOT should have required, Rodarte provides no affirmative evidence that Reno failed to comply with the contract provisions and specifications KDOT did require. In other words, the Wendling affidavit speaks to KDOT's potential liability, not Ashland's.

The obvious purpose behind K.S.A. 68-419a is to shield contractors from liability when an accident results from a completed highway project that the contractor had no role in designing. Such protection is logical, practical, and necessary. Where, as here, the contractor merely followed the specifications given to it by the State, it cannot be held liable for damages, even if the State's design was flawed. The immunity under K.S.A. 68-419a applied to Ashland; summary judgment was appropriate.

## CROSS-APPEAL

State Farm cross-appeals the district court's denial of various motions, all of which essentially assert that Kellerman should not have been allowed to testify that there was a phantom motorist whose erratic, unsafe driving caused the accident. State Farm won the jury trial; Rodarte is not entitled to a new trial; the cross-appeal

is moot. " 'The court is statutorily and constitutionally without authority to render advisory opinions in cases found to be moot. A case is moot when no further controversy exists between the parties and where any judgment of the court would be without effect.' " *In re T.D.*, 27 Kan. App. 2d 331, 333, 3 P.3d 590, *rev. denied* 269 Kan. 933 (2000) (quoting *State ex rel. Stephan v. Johnson*, 248 Kan. 286, Syl. ¶ 3, 807 P.2d 664 [1991]).

Affirmed.