No. 80,582

LAWRENCE S. JENKINS, *et al., Appellees,* v. T.S.I. HOLDINGS, INC., *et al., Appellants.*

(1 P.3d 891)

Opinion filed March 10, 2000.

*Leonard B. Rose,* of Lewis, Rice & Fingersh, L.C., of Kansas City, Missouri, argued the cause, and *Jed D. Reeg,* of the same firm, was with him on the brief for appellants.

*Mark D. Hinderks,* of Stinson, Mag & Fizzell, P.C. of Leawood, argued the cause and *Heather* S. *Woodson,* and *Michael L. Kahn,* of the same firm, were with him on the brief for appellees.

The opinion of the court was delivered by

SIX, J.: This is a breach of contract case involving the sale of T.S.I. Holdings, Inc. (TSI). When the sale did not close, sellers filed a declaratory judgment action. The buyers responded with a breach of contract counterclaim. A trial was held, and an appeal taken. We resolved several issues in *T.S.I. Holdings, Inc. v. Jenkins,* 260 Kan. 703, 924 P.2d 1239 (1996) (*T.S.I. I*), and remanded for a new trial on the buyers' (Roger W. Hood, M.D., and Lawrence S. Jenkins) claim for breach of contract against the sellers (T.S.I. Holdings, Inc., Melvyn Paul, Phillip and Barbara Hodes, *et al.*). This appeal by sellers follows the second trial that resulted in a $4 million verdict for buyers. We refer the reader to *T.S.I. I,* 260 Kan. at 707 for the factual background that sets the stage for presentation of the issues here.

Our jurisdiction is under K.S.A. 20-3018(c) (a transfer from the Court of Appeals on our own motion).

The issues now before us are whether: (1) the jury's verdict is inconsistent; (2) the district court erred in finding that a violation of the contract's "no-shop" clause was an independent basis for damages; (3) the buyers failed to prove their damages within a reasonable degree of certainty; (4) there is substantial evidence to support the jury's finding that buyers were damaged because of sellers' breach; (5) the district court erred by allowing buyers to present evidence of a later sale of T.S.I. stock to a third party; and (6) the district court erred in determining that sellers are jointly and severally liable under the contract.

Finding no reversible error, we affirm.

## FACTS

The jury here found that the sellers violated two contract provisions. Sellers failed to use their "best efforts" to close the deal, and by discussing a possible sale of TSI to Citibank, contravened the 4.1(c) "no-shop" (nondisclosure) clause. The jury awarded buyers $1 million for breach of the best efforts clause and $3 million for breach of the no-shop clause. The district court entered a $4 million judgment against the sellers. After the jury's verdict, several sellers filed for Chapter 11 and Chapter 13 bankruptcy. Buyers filed an involuntary Chapter 7 bankruptcy petition against sellers Phillip and Barbara Hodes. This appeal was initially taken by all the sellers. However, after the bankruptcy proceedings began, most of the sellers settled with buyers. The only remaining sellers are Phillip and Barbara Hodes. The bankruptcy court lifted the automatic stay on this appeal so that the legitimacy of the $4 million judgment could be ascertained.

## DISCUSSION

The Hodes, for their first issue, focus on the special verdict form, contending the jury's verdict is inconsistent. The verdict form had two blanks to indicate whether the sellers had breached the contract (one for a no-shop clause breach and the second for failing

to use best efforts). The form also had two blanks for the damage, if any, caused by each breach.

The Hodes assert that the jury's verdict cannot stand because any breach of the contract caused the buyers to sustain the same damage: the loss of the benefit of their bargain. Because the only damages at issue here were "loss of the benefit of the bargain," the Hodes contend that damages cannot be $1 million for one breach and $3 million for the other. The Hodes argue different amounts cannot be awarded for each type of contract violation because each violation resulted in the same harm (the sale not being consummated).

The buyers counter with two responses. First, they contend that the jury's verdict is not inconsistent. According to buyers, the instructions suggest that the jury found that the breach caused $4 million in damages and intended the individual sums to be added together. The buyers also assert invited error resulting in waiver of the "same damage" argument. Buyers contend that the Hodes may not complain about the alleged defect in the verdict form because the form submitted to the jury followed the form requested by sellers.

The Hodes address the issue of waiver and invited error in their reply brief. They contend they consistently argued a breach of the "no-shop" clause could not independently support an award of damages. However, the district court ruled against them, and they resubmitted a verdict form consistent with the district court's ruling.

A review of the jury instructions shows that the sellers submitted 4 different verdict forms to the district court. The first was submitted on October 20, 1997, presumably according to the pretrial order which directed the parties to provide proposed instructions 2 weeks before trial. The sellers' October 20 verdict form referenced both "best efforts" and "no-shop" (Sec. 4.1[c]) damages. The October 20 form also asserted sellers' waiver and estoppel arguments. This form had two damage blanks. In that respect it is similar to the one ultimately given to the jury. On November 6, the fourth day of trial, sellers submitted two alternate verdict forms. Both forms provided for individual instead of joint and several li-

ability. However, only one of these forms removed the "no-shop" breach as a basis for awarding damages. (To assist our discussion, we label it form A.) Form A provided for damages only on the best efforts provision. Form A did not mention the section 4.1(c) no-shop clause. The second verdict form (form B) allowed for finding individual liability on the best efforts issue, but added individual liability on the 4.1 (c) no-shop clause, plus the defenses of waiver and estoppel. Form B requested a two-blank damages submission as had sellers' original October 20 verdict form submission.

On November 6, the district court rejected sellers verdict forms A and B with three rulings. The district court found: (1) the sellers could be held jointly and severally liable, (2) waiver and estoppel issues could be argued to the jury, but would not be included on the verdict form, and (3) a breach of the "no-shop" clause was an independent basis for damages. The following day, sellers submitted a fourth verdict form that was eventually adopted by the district court and given to the jury. The sellers' counsel said:

> "Our verdict form [the fourth one] is obviously made in light of the Court's rulings yesterday on the joint and several liability issue and the submission of the breach of the no-shop clause issue to the jury, and we still feel that our verdict form, as contained in our additional revised jury instructions, [forms A and B, dated November 6, 1997] is the verdict form that we would wish the Court to use. But this verdict form is given in light of the rulings yesterday."

Although the Hodes did not waive the "two damage blanks" argument, they may have invited any error. Not only is sellers' October 20 verdict form in conflict with the "two damage blanks" argument on appeal, Form B, one of the November 6 revised forms, is as well. Both verdict forms provided blanks for two separate damage awards. Although the appellate call is a close one, we do not find a clear case of invited error. Sellers consistently made the broader argument that the no-shop clause was not an independent basis for damages.

We now turn to the cardinal question: Is the verdict inconsistent? We open our analysis with a general rule. A jury's findings on the essential issues submitted by way of special verdicts must be certain and definite. The findings must not be conflicting or inconsistent. The findings are to be construed in the light of the

surrounding circumstances and in connection with the pleadings, instructions and issues submitted. If the answers in respect to the controlling facts are inconsistent, a judgment should not be rendered but a new trial ordered. *Rohr v. Henderson*, 207 Kan. 123, Syl. ¶ 5, 483 P.2d 1089 (1971).

Here, the district court declined to remit the verdict or order a new trial.

The district judge said:

"The Court reconciles the verdict from the standpoint that the jury heard evidence upon which it could make a finding that the plaintiffs' damages were as much as $4 million. I cannot explain nor do I believe it's my responsibility to explain why the jury chose to answer one part of the verdict form with a $3 million award and another part with a $1 million award. But the Court construes the damage award of the verdict to be integrated and be in the amount of $4 million, which is clearly within the testimony of Dr. Barry. [Buyers' expert on damages.]"

Although we question the propriety of submitting a verdict form with two places for the jury to award damages, a review of the record sheds some light on why it was done here.

The buyers asked for a separate determination of the damages attributable to each type of violation (no-shop and best efforts) the jury might find. The buyers contended the contract provided for attorney fees, and it would be necessary to determine a prevailing party. The buyers were seeking only one type of damages here: The loss of the benefit of their bargain had the deal closed. During chambers arguments on jury instructions, the buyers asked that the jury be allowed to find a violation of the no-shop clause and make an award of nominal damages. The following excerpts from the chambers discussion show that the sellers' position was that the jury could only award damages to the buyers if it found two things: (1) a breach of the best efforts provision, and (2) that breach, instead of the bank not releasing Melvyn Paul's (one of the sellers) stock, caused the deal not to close.

Sellers' counsel: "I say that because all roads lead to only the one issue, which is best efforts. If it's determined that we didn't use best efforts, then if that—if damages result, we lose. But if my clients did use best efforts, or if my clients didn't use best efforts, but the bank wasn't going to release the stock, there's no damages."

Later, counsel for the buyers argued that damages for breach of the no-shop clause should be included as a separate provision on the verdict form.

> Buyers' counsel: "On that subject, the no-shop—the violation of the no-shop clause at least could give rise to nominal damages, which, in this case carries with it legal significance because of the provision under the contract and the claim in this case for attorney's fees in the event a breach of the contract is found."

A discussion followed regarding recovery of nominal damages in a breach of contract case. Sellers' counsel objected to any language on nominal damages. The district court ruled there would be no mention of nominal damages. The buyers' request for two separate damage findings would be allowed. This chain of events put before the jury a verdict form that allowed for two separate damage awards.

The Hodes argue that the district court erred in ruling that the separate question of breaching the "no-shop" clause should be submitted to the jury as an independent basis of damages. They contend, as a matter of law, that a no-shop breach could not have caused damage to buyers. We now review this contention, as it is closely tied to sellers' verdict form inconsistency argument.

The district court did not state its rationale for ruling the no-shop clause could serve as an independent basis for damages. The sellers argued that if the jury found a breach of the no-shop clause, but no breach of the best efforts clause, there could be no damage award. It is not clear from the record that the sellers specifically argued for the removal of the no-shop damages blank from the verdict form. However, the sellers made the broader argument that a violation of the no-shop clause was irrelevant because of the type of damages sought.

That broad argument is not persuasive. The district court did not err by submitting the question of whether the sellers violated the no-shop clause to the jury. In *T.S.I. I,* we said:

> "On remand, a disputed question will be whether sellers breached the Agreement by violating Sections 4.1(a) (best efforts) and 4.1(c) (nondisclosure [no-shop]). Buyers' allegations supporting their unclean hands defense, including their assertions concerning Paul's discussions with Zeko and Luikart between February 4

and March 22, 1993, will be relevant to the claim that sellers breached the Agreement in failing to use best efforts." 260 Kan. at 721.

A jury might reasonably find that if sellers are out trying to get a better offer, they are not using their best efforts to close the deal. Thus, it was proper to submit the question of a 4.1(c) no-shop violation to the jury. A remaining question is whether it was improper to provide two blanks for the jury to award damages based on the no-shop clause and the best efforts clause.

We, of course, do not know what the jury would have done if the verdict form had been drafted with only one blank for a damage award. The Hodes advance a secondary position that damages should be only $1 million because the best efforts violation was the only one that could independently support a damage award. We do not agree.

If a careful reading of the form, coupled with the instructions clearly establishes the intent of the jury and resolves the verdict's ambiguity, we may uphold the verdict. See *Equitable Life Leasing Corp. v. Abbick*, 243 Kan. 513, 514, 757 P.2d 304 (1988). Here, the jury was instructed to "award the plaintiffs such *sum*" as it believed would adequately compensate them for the breach of the contract. The total amount of the verdict could not exceed $7 million. The "sum" that the jury awarded was $4 million.

A consistent reading of the form and instructions under the circumstances of this case suggests the jury determined that the sellers breached the contract both by talking to Citicorp about selling it an interest in the company in violation of the no-shop clause and by failing to use their best efforts to close the contract. The jury then determined that buyers' total benefit of the bargain which was lost due to defendants' breach was $4 million which they allocated between the two damage blanks they were given.

As will be discussed in more detail below, the $4 million award is borne out by the evidence. We also note most of the affirmative action taken by sellers in contravention of the contract was that prohibited by the section 4.1(c) no-shop clause for which the jury awarded $3 million of the $4 million. Although a single blank for total damages would have resolved sellers' appellate complaint, un-

der these circumstances it was arguably consistent to make two separate damage awards of two separate amounts. Our affirmance here, however, is not to be taken as precedent for multiple damage blanks in verdict forms in benefit of the bargain contract damage actions. We suggest that a court and jury are seldom, if ever, capable of determining the exact and perfect application of losses caused by a contract breach. The effort of the court and jury is directed toward placing the injured parties in as good a position as a performed contract would have given them. We believe that effort was accomplished here. We find no reversible error in the verdict form.

### The $4 Million Award

The Hodes next challenge the damage award on the ground that the buyers did not prove their damages with "reasonable certainty." The Hodes call attention to the structure of the transaction at issue. Under the contract, the buyers would purchase 51% of TSI for $2.5 million. One million dollars in cash, along with a note for $1.5 million was due on the day of closing. The note was payable 1 year from that date and secured by TSI stock. On closing, the buyers were to obtain an option to purchase the remaining 49% of TSI for $2 million. The Hodes do not dispute that the sellers (Hood in particular) had a loan commitment to pay the $1 million due in cash at closing. They do dispute there was evidence that Hood could pay the $1.5 million note a year later. The damages here were based on the assumption that buyers would have ultimately owned 100% of TSI. The Hodes contend that because it was unclear whether Hood could have paid the $1.5 million note or the $2 million for the remaining shares, the damages were speculative. They cite *Apperson v. Security State Bank*, 215 Kan. 724, Syl. ¶ 7, 528 P.2d 1211 (1974), and *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044 (2d Cir. 1995).

*Apperson* and *McMahan* indicate that if damages are contingent on the happening of some event and the plaintiffs cannot prove that contingency will occur, a damage award cannot stand. *McMahan*, 65 F.3d at 1050; *Apperson*, 215 Kan. at 735-36. Here, the Hodes contend that damages were based on the sellers having ac-

quired 100% of TSI. However, contingencies must occur before buyers could obtain that 100%. The first contingency was Hood's ability to pay the $1.5 million note. The second was Hood's ability to exercise the option to purchase the remaining 49% of TSI.

The Hodes' argument invites careful consideration. On direct examination, Hood testified:

"Q: Did you have the means to pay off that note one year from the closing?
"A: Yes.
"Q: How would you have done that?
"A: Any of several different ways. I could have liquidated some assets. I certainly had assets in excess of that. I could have brought in my friend Stan Goldberg as a partner. We had not specifically discussed an actual arrangement, but he knew about the business and was kind of kept informed of it. In fact, he knew about it before I knew about it. He knew Mr. Paul before that. So I had numerous ways of raising that kind of money."

When asked what his net worth was, Hood answered, "Several million dollars." Although the Hodes do not argue that Hood could not pay the initial $1 million in cash, they do point out that he had difficulty getting that money. Hood admitted on cross-examination that he did not have his own $1 million in cash to close the transaction. Hood could only obtain a loan commitment for $250,000 based on his personal assets (a mortgage on his home and his medical accounts receivable). His friend, Stan Goldberg, provided the creditworthiness to support the additional $750,000 for the $1 million total loan commitment. Three other banks turned Hood down for the $1 million loan.

Hood's lender testified. In the lender's opinion, Hood would have been able to pay off the $1.5 million note. Based on this corroborating testimony, there is sufficient evidence to support a finding that Hood would have acquired 51% of TSI.

There is less evidence in the record to support a finding that Hood could have exercised the option to buy the remaining 49% of TSI. On cross-examination, Hood said that he did not know where he would get the $2 million to pay for the stock options. He contended that he would be able to borrow it, liquidate assets or take on partners. We find no financial statement for Hood in the record.

The contingent nature of the stock options and Hood's ability to pay for them presents a close question. Both the damage testimony and the jury's verdict assumes Hood's 100% ownership of TSI. We also have the issue of timing. All damage evidence attempted to value TSI in March 1993, when the deal should have closed. But even if the deal had closed, the buyers would not have owned 100% of TSI in March 1993; they would have owned only 51%.

Both *McMahan & Co.* and *Apperson* require proof that certain events would occur to prove damages with reasonable certainty. Although it is not clear from the record here that Hood would have or could have personally exercised the option, that is not as critical under these facts as the Hodes would assert. The Hodes fail to acknowledge the position Hood would have been in if the deal closed. Hood would have owned a 51% controlling interest in TSI with an option to buy the remaining 49% any time over the next 10 years. The Hodes ask us to speculate as to whether Hood's desired ownership of 100% *of TSI's stock* would ever have come to fruition. That is not our focus. Our focus is on what rights Hood would obtain, if the agreement had not been breached, and the value of those rights.

The buyers proved their damages with reasonable certainty. The buyers showed Hood would have obtained the valuable contract rights at issue (a controlling interest and option) and his damages for not having obtained those rights. Buyers' damage expert testified that TSI was worth in the range of $8 to $14 million. Subtracting the purchase price, the expert testified that damages could be in the range of $3.5 to $9.5 million. If the deal closed, Hood would have owned the company for all practical purposes. The buyers' expert testified that Hood could have sold TSI to an able buyer. In that respect, Hood owned TSI. The expert's damage estimates were not speculative.

## Causation

The Hodes next argue that there was insufficient evidence that the sellers' breach actually caused the damages at issue. The Hodes contend that irrespective of whether the sellers breached the con-

tract, the deal could not close because the Midland Bank refused to release Paul's pledged stock (the "Midland Pledge").

When a verdict is challenged for insufficiency of evidence we do not weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 361-62, 837 P.2d 330 (1992).

Considering the evidence under our standard of review, we find sufficient proof that the sellers' breach caused the buyers' damages. Although the sellers presented a plausible story that the stock release was an issue out of their control, the jury was entitled to disbelieve that story. Testimony by Melvyn Paul and his personal banker, John Grams, raised questions as to whether sellers used their best efforts to obtain a release of the stock. Grams was the Midland Banker who allegedly refused to release the stock because of pressure by FDIC regulators. At trial, Grams testified that he did not ask the regulators if he could release the stock, and the regulators never instructed Grams not to release it. Grams contended that neither Paul nor sellers' attorneys ever tried to convince him to release the stock between January and March 1993. Grams said that no one from the sellers' side ever told him that the release issue was holding up the sale of TSI. Based on this testimony alone, the jury could have concluded that the sellers did not use their best efforts to close the deal.

## The Sale to TRIACQ Corp.

The Hodes contend that the district court erred when it allowed the buyers to present evidence of TSI's sale to TRIACQ Corp. The sale occurred in 1995 and involved 85% of TSI's stock. The Hodes emphasize remoteness, arguing that evidence of the 1995 sale is irrelevant to TSI's value in 1993 when the contract was allegedly breached.

Rulings on admissibility of evidence fall within the sound discretion of the district court. One attacking such an evidentiary ruling must show an abuse of discretion. An abuse of discretion exists

only when no reasonable person would take the view adopted by the district court. *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, Syl. ¶ 9, 822 P.2d 617 (1991).

The remoteness argument lacks merit. Evidence is relevant if it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). The issue of damages was a material fact here. The amount that a purchaser is willing to pay for a company in the marketplace demonstrates the actual value of the company. Here, a purchaser offered and actually paid money for TSI only 2 years after sellers allegedly breached their contract to sell the company to buyers. The remoteness of the sale goes to the weight of the evidence; not its admissibility. The district court allowed the sellers wide latitude in explaining changes that occurred during the 2-year interim. The jury was free to consider the time elapsed and the changes that took place during that time. The district court did not abuse its discretion in allowing this evidence.

### Joint and Several Liability

The Hodes' last argument is that they are not jointly and severally liable for the damages awarded by the jury. Resolution of this issue requires an interpretation of the contract. On appeal, a written instrument or contract may be construed and its legal effect determined by the appellate court regardless of the construction made by the district court. *First Financial Ins. Co v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515 (1998).

The district court determined that all signatories to the agreement were jointly and severally liable because of the following italicized language:

"**Section 4.1. Further Assurances of TSI, Subsidiaries, Shareholders, Paul, and Hodes.** TSI, Subsidiaries, Shareholders, Paul and Hodes *jointly and severally* agree as follows:

(a) TSI, Subsidiaries, Shareholders, Paul, and Hodes will use their respective best efforts . . . .

. . . .

(c) None of TSI, Shareholders, nor any of the stockholders, directors, officers, employees, agents, or representatives of TSI or any of the Subsidiaries, shall, during the period commencing on the date hereof and continuing until the Closing or the termination of this Agreement as herein provided, discuss, negotiate, or

deal with any other corporation, firm, or other person, or entertain, solicit, accept, or consider any inquiries, offers, or proposals relating to the sale of any common stock or assets of TSI or any of the Subsidiaries." (Emphasis added.) (The "no-shop" clause.)

The Hodes argue that the language *"respective* best efforts" means that they are not jointly and severally liable for breaching the 4.1(a) best efforts clause. They argue the district court's interpretation reads the word "respective" out of the provision, citing *Wiles v. Wiles*, 202 Kan. 613, 452 P.2d 271 (1969). *Wiles* observes the cardinal rule of construction that all provisions of a contract be construed in such a manner as to be consistent with one another so that all provisions can be given effect. 202 Kan. at 619. The district court's interpretation does not violate this cardinal rule. The word "respective" is not a provision of the agreement. Furthermore, the word is not read out of the agreement by finding joint and several liability. Parties may well agree to be jointly and severally liable if each *respective* party does not use his or her best efforts in a transaction. Joint signatories to a contract are often held jointly and severally liable for its breach. See *e.g., Hawkinson v. Bennett*, 265 Kan. 564, 583, 962 P.2d 445 (1998). This argument fails.

Affirmed.

LARSON, J., not participating.

CHRISTEL E. MARQUARDT, J., assigned. [1]

---

[1] **REPORTER'S NOTE:** Judge Marquardt, Judge of the Kansas Court of Appeals, was appointed to hear case No. 80,582 vice Justice Larson pursuant to the authority vested in the Supreme Court by K.S.A. 20-3002(c).