(115 P.3d 165)
No. 91,946

KATHLEEN S. ZAK, *Appellant*, v. LAWRENCE D. RIFFEL, M.D., *et al., Appellees.*

Opinion filed July 15, 2005.

*Pieter A. Brower*, of Pieter A. Brower, P.C., of Kansas City, Missouri, and *Robert P. Numrich*, of Baty, Holm & Numrich, P.C., of Kansas City, Missouri, for appellant.

*Mark A. Lynch, Reid F. Holbrook*, and *Eric A. Morrison*, of Holbrook & Osborn, P.A., of Overland Park, for appellee.

*Kyle J. Steadman* and *James R. Howell*, of Bradshaw, Johnson & Hund, of Wichita, and *Gary D. White*, of Palmer, Leatherman & White, LLP, of Topeka, for *amicus curiae* Kansas Trial Lawyers Association.

Before MALONE, P.J., GREEN and BUSER, JJ.

MALONE, J.: Kathleen S. Zak filed a medical negligence case seeking damages for the wrongful death of her husband, Michael Zak, a 48-year-old business executive, from dilated cardiomyopathy. The case proceeded to trial against only Dr. Lawrence D. Riffel. The jury returned a verdict finding Dr. Riffel to be 51% at fault and Michael to be 49% at fault. The jury awarded $100,000 in total damages. The primary issue we will address on appeal is whether the trial court erred by giving an instruction which allowed the jury to allocate fault to Michael because of his "obesity and lifestyle." We will also address whether the trial court violated the collateral source rule by admitting evidence of a $262,500 payment made to Kathleen by Michael's employer after Michael's death.

*Factual and procedural background*

In 1988, Michael became a patient of Dr. Fred Farris at the Kenyon Clinic. In 1992, Michael was diagnosed with aortic stenosis, a congenital defect in one of the valves of his heart. Michael underwent surgery for an aortic valve replacement on April 2, 1992. As a result of the damage due to the defective valve, however, Michael was left with a chronic condition known as left ventricular dysfunction in which the left ventricle of the heart was unable to pump the normal amount of blood from that chamber. Michael was obese and significant weight loss and lifestyle adjustments were suggested as a way to manage the left ventricular dysfunction.

In May 1996, Dr. Farris referred Michael to his partner, Dr. Riffel, for evaluation and consultation regarding weight loss. On May 30, 1996, at the time of the initial consultation with Dr. Riffel, Michael weighed 309 pounds and had borderline elevated blood pressure. Michael's cholesterol, triglycerides, and LDL cholesterol were all high. In a letter memorializing the consultation, Dr. Riffel advised that Michael's chest x-ray appeared normal and his electrocardiogram (EKG) was unchanged from previous EKG's in 1992 and 1994. The letter concluded that Michael was in good health and an excellent candidate for the weight loss program.

Dr. Riffel put Michael on a weight loss program of diet, exercise, and medication, which included a prescription for phentermine. Michael's goal was to lose about 80 pounds. The weight loss program was initially successful. Michael lost 89 pounds to a weight of 220 pounds. Blood pressure and cholesterol readings were down, and the weight loss program was stopped in May 1997.

By the time of his annual physical on November 25, 1997, Michael had regained 18 pounds. Dr. Riffel concluded that Michael was in excellent health, but he stressed the importance of continuing to exercise and watching his diet. In February 1998, Michael saw Dr. Riffel because he was concerned and upset that he was gaining weight despite exercising regularly. Dr. Riffel gave Michael another prescription for phentermine, but he did not continue taking the prescription beyond 30 days.

On December 21, 1998, Michael had his annual physical. Dr. Riffel noted that Michael's weight had gradually increased to 265

pounds. Michael reported that his appetite had been difficult to control. Michael's blood pressure, cholesterol, and LDL cholesterol were elevated. Dr. Riffel concluded that Michael's chest x-ray was clear and his EKG had not changed significantly. He did not refer Michael to a cardiologist because he felt comfortable managing the left ventricular dysfunction.

On February 12, 1999, Michael went to the St. Joseph Health Center Emergency Room after he woke up experiencing chest pain and shortness of breath. Dr. Michael Reilly performed an examination and ordered a chest x-ray and EKG. Dr. Reilly reported the results of the tests as normal and diagnosed Michael with gastritis. He was given a gastrointestinal cocktail and discharged with a 10-day supply of Prevacid. The next day, Michael and Kathleen left for a scheduled vacation to Hawaii after reporting the emergency room visit to Dr. Riffel.

On February 22, 1999, after returning from vacation, Michael saw Dr. Riffel. Michael informed Dr. Riffel of the details of the emergency room visit on February 12, 1999. Michael also related to Dr. Riffel that he had several episodes of mild chest discomfort in the middle of the night while on vacation. Michael told Dr. Riffel that he had never had symptoms like this before. Dr. Riffel examined Michael and concluded he had gastroesophageal reflux disease (GERD). He continued the Prevacid medication.

On March 17, 1999, Michael left work early because he was not feeling well. On March 18, 1999, Michael again came home from work early and told Kathleen he was not feeling well. About 9:45 p.m., Michael began to have problems breathing, and Kathleen called 911. The paramedics arrived and found Michael in respiratory arrest. Efforts to resuscitate began, and Michael was transported to the hospital. After resuscitation efforts failed at the hospital, Michael was pronounced dead at 10:37 p.m., by Dr. Kevin Koch. Dr. Koch concluded that Michael had a cardiopulmonary arrest with pulmonary edema and called the coroner's office to schedule an autopsy.

Dr. Michael Handler conducted the autopsy and concluded that Michael died of an arrhythmia due to an enlarged heart, or dilated cardiomyopathy culminating in a cardiac arrest. Dr. Handler tes-

tified that Michael's heart weighed 880 grams at the time of the autopsy where a normal heart would weigh 350-420 grams. Any heart weighing over 600 grams is considered electrically unstable. Based on the scar tissue found on the heart, Dr. Handler believed that Michael had two previous heart attacks, but he could not date the attacks. At the time of his death, Michael weighed 272 pounds.

Kathleen filed her petition for medical negligence and wrongful death on March 15, 2001. Kathleen originally brought her lawsuit against Dr. Riffel and several other providers. Prior to trial, settlement agreements were reached and all the other providers were dismissed with prejudice, leaving Dr. Riffel as the sole defendant. Kathleen alleged that Dr. Riffel failed to properly diagnose and manage Michael's heart condition, failed to refer Michael to a cardiologist for treatment, and failed to advise Michael of the abnormal tests performed at the Kenyon Clinic.

On June 16, 2003, the case was tried to a jury. Dr. John Daniels, Kathleen's internal medicine expert, testified that Michael's EKG was "very abnormal," and his chest x-ray taken by Dr. Riffel in 1996 showed an enlarged heart at that time. Dr. Daniels testified that the standard of care required that Dr. Riffel place Michael on an ACE Inhibitor rather than prescribing phentermine as part of a weight loss plan. An ACE Inhibitor operates to decrease the workload on the heart, and Dr. Daniels testified it was standard therapy to use ACE Inhibitors on patients with left ventricular dysfunction by the mid-1990's. Dr. Daniels noted that phentermine was contraindicated for individuals with cardiac disease.

Based upon his review of the test results from Michael's December 21, 1998, annual physical, Dr. Daniels concluded that Michael had substantial left ventricular dysfunction that presented a life-threatening problem requiring treatment. Dr. Daniels testified the results from the December 1998 echocardiogram indicated that the heart was getting larger and the disease process was getting worse. Dr. Daniels opined that the standard of care required Dr. Riffel to have referred Michael to a cardiologist at that time.

Based upon his review of the records from Michael's emergency room visit on February 12, 1999, Dr. Daniels concluded that Michael was clearly in congestive heart failure. Dr. Daniels stated that

Michael's further complaints of pain while on vacation should have alerted Dr. Riffel to be suspicious of the GERD diagnosis. According to Dr. Daniels, Michael required an urgent cardiac evaluation at that time, and Dr. Riffel's failure to provide proper management of Michael's condition contributed to his death.

Dr. Daniels' testimony was corroborated by two cardiologists, Dr. Dan Fintel and Dr. Dennis Bresnahan. Dr. Fintel testified that by the mid-1990's, ACE Inhibitors were absolutely standard of care for patients with enlarged hearts and cardiomyopathy. He believed that Dr. Riffel's failure to manage Michael's heart condition reduced his life expectancy by 5 to 10 years. Dr. Bresnahan opined Michael's life expectancy could have been 7 to 10 years with proper care.

At trial, Dr. Riffel admitted that Michael's chest x-ray and EKG results were abnormal. He testified that his entries in the medical records to the contrary meant that the results were "normal for Michael's condition." Dr. Riffel did not believe that Michael's heart condition was getting worse because he had not developed any symptoms of heart failure.

Dr. Riffel's experts testified that the use of ACE Inhibitors was not the standard of care for asymptomatic left ventricular dysfunction. They testified that weight loss and lifestyle changes were effective treatment for the condition. They also testified there was no indication in Michael's medical history which should have alerted Dr. Riffel to refer Michael to a cardiologist.

Dr. John Ward, economist, testified regarding a calculation of lost wages. Michael was an executive with BHA Group at the time of his death. Dr. Ward testified that BHA Group was a rapidly growing company from 1996 to 1998. Michael earned $592,000 in 1996, $363,000 in 1997, and $693,000 in 1998. According to Dr. Ward, total wage loss for a 5-year life expectancy was $1,077,737; total loss for a 10-year life expectancy was $2,132,797.

Jim Shay, chief financial officer for BHA Group, testified that after Michael's death, BHA Group's board of directors elected to pay Kathleen a total of $262,500. This was the result of an earlier agreement that in the event of Michael's death, his salary would be continued for 1 year. Shay testified the payment was a death

benefit and not regular compensation. However, the payment was recorded in the company books as payment from a "bonus account."

Prior to trial, Kathleen filed a motion in limine to exclude evidence of the $262,500 payment on the grounds that it constituted a collateral source payment. Dr. Riffel argued that he should be allowed to cross-examine Dr. Ward regarding this information because Dr. Ward had not counted the payment in his calculations and conclusions regarding economic loss. According to Dr. Riffel, this omission showed a bias by Dr. Ward which affected his credibility as a witness. The trial court ruled that it would allow the evidence of the $262,500 payment to be presented to the jury for the limited purpose of laying a foundation for the defense to cross-examine Dr. Ward about his report.

At the conclusion of the trial, the district court instructed the jury to compare fault between Michael and Dr. Riffel. The jury returned a verdict, finding Dr. Riffel to be 51% at fault and Michael to be 49% at fault. The jury awarded $100,000 in total damages, which included $25,000 for medical expenses and $75,000 for past economic loss. The jury did not award any damages for past or future noneconomic loss, past or future loss or impairment of services, or future economic loss. Kathleen filed a motion for a new trial which was denied. She timely appeals.

Kathleen raises five issues on appeal: (1) the trial court violated the collateral source rule by admitting evidence of the $262,500 payment; (2) the trial court erred by giving Instruction No. 14 because it allowed the jury to allocate fault to Michael because of his obesity and lifestyle; (3) Kathleen was denied a fair trial due to juror misconduct; (4) the damage award was inadequate and contrary to undisputed evidence; and (5) the trial court erred in limiting the cross-examination of an expert witness regarding Dr. Riffel's prescription for phentermine as part of Michael's weight loss program. We will begin with the claimed error involving Instruction No. 14.

### Instruction No. 14

Kathleen claims the trial court erred by giving jury Instruction No. 14 because it allowed the jury to allocate fault to Michael because of his obesity and lifestyle. Kathleen had objected to the instruction at trial on the basis that it was not supported by the evidence.

"The trial court is required to properly instruct the jury on a party's theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and the jury could not reasonably have been misled by them, the instructions will be approved on appeal. [Citation omitted.]" *Wood v. Groh*, 269 Kan. 420, 423-24, 7 P.3d 1163 (2000).

The trial court gave Instruction No. 14 to the jury which identified the party's "claims and defenses" as follows:

"Issues-Plaintiff's Claim

"The plaintiff, Kathy Zak, claims that she sustained damages as a result of the death of her husband and due to the fault of the defendant.

"The plaintiff claims that she sustained damage due to the fault of the defendant, Dr. Lawrence Riffel, in:

1. Failing to properly manage Michael Zak's heart condition;
2. Failing to refer Michael Zak to a cardiologist; and,
3. Failing to advise Michael Zak of the abnormal diagnostic test results performed at the Kenyon Clinic.

"Burden of Proof-Plaintiff's Claim

"The plaintiff has the burden to prove that it is more probably true than not true that she sustained damages caused by any one or more of the claimed negligent acts or omissions of the defendant. When more than one specified negligent act or omission is alleged against a defendant, agreement as to which specific act or omission is not required.

"Issues-Defendant's Admissions and Denials

"The defendant denies any and all claims of negligence asserted against him by plaintiff, and specifically, denies that he departed from acceptable standards of medical care with respect to the care and treatment provided to Michael Zak by him under the circumstances of this case. This defendant asserts that the care and treatment provided by this defendant was within acceptable standards of care for similarly situated physicians given the circumstances of this case.

"This defendant asserts that the death of Michael Zak was not the result of, or caused by, any act or omission on the part of this defendant. Instead, the death

of Michael Zak was the result of a pre-existing cardiomyopathy that was aggravated by Michael Zak's obesity and lifestyle.

"This defendant denies the nature and extent of the damages alleged by to have been sustained by the plaintiff."

Instruction No. 14 provided the basis for the trial court to further instruct the jury on the comparative fault of Michael and Dr. Riffel. Kathleen failed to object to any of the comparative fault instructions except for Instruction No. 14. However, the standard of review requires us to view the instructions as a whole in order to establish whether they are substantially correct.

The Kansas comparative negligence statute "requires a weighing of the causal negligence, if any, of all parties whose conduct brought about the harm, and the consequent imposition of individual liability for damages based upon the proportionate fault of each party to the occurrence." *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 844-45, 610 P.2d 1107 (1980); see K.S.A. 60-258a. The concept of fault consists of two components, negligence and causation. Negligence is the lack of ordinary care. It is the failure of a person to do something that an ordinary person would do, or the act of a person in doing something that an ordinary person would not do, measured by all the circumstances then existing. *Beck v. Kansas Adult Authority*, 241 Kan. 13, 33, 735 P.2d 222 (1987). A party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which a claim is made. *Sharples v. Roberts*, 249 Kan. 286, 295, 816 P.2d 390 (1991); PIK Civ. 3d 105.01. Thus, to establish comparative fault, Dr. Riffel was required to present sufficient evidence that Michael was negligent and that his negligence caused or contributed to his injury and death.

Michael was obese and had a heart condition. However, a patient's prior condition which required him to be under a physician's care cannot be a basis for comparative fault in a negligence claim against the physician:

"Conduct prior to an injury or death is not legally significant in an action for damages, unless it is a legal or proximate cause of the injury or death. It is inconsistent with the reasonable and normal expectations for the court to excuse or reduce the medical provider's liability simply because it was the patient's own

fault that he or she required care in the first place." *Huffman v. Thomas*, 26 Kan. App. 2d 685, Syl. ¶ 2, 994 P.2d 1072, *rev. denied* 268 Kan. 846 (1999).

On appeal, Dr. Riffel asserts the basis for the jury to assess fault against Michael was his failure to follow Dr. Riffel's reasonable treatment advice. Kansas law recognizes a patient's duty to follow reasonable directions and advice given to the patient by a health care provider. See *Cox v. Lesko*, 263 Kan. 805, 819-20, 953 P.2d 1033 (1998) (patient failed to complete her physician-ordered physical therapy); *Wisker v. Hart*, 244 Kan. 36, 39-41, 766 P.2d 168 (1988) (patient disregarded his physician's warnings to refrain from strenuous work and returned to his physically demanding job soon after he suffered internal injuries in a motorcycle accident).

However, the evidence at trial supporting Dr. Riffel's assertion that Michael failed to follow reasonable treatment advice was tenuous. The only specific evidence cited by Dr. Riffel to support this claim was Michael's failure to keep his weight down and his failure to renew the phentermine prescription in 1998. The evidence was undisputed that Michael was overweight. However, the mere fact that Michael regained much of the weight that he had initially lost does not prove that Michael failed to follow Dr. Riffel's treatment advice. To the contrary, the testimony supported the fact that Michael continued to watch his diet and exercised regularly. In fact, Dr. Riffel testified that Michael was an "excellent patient," and Dr. Riffel was shocked when he learned of Michael's death. Furthermore, Michael's failure to renew his prescription for phentermine could hardly be considered as fault in light of the evidence that phentermine was contraindicated for individuals with cardiac disease.

During the closing argument, Dr. Riffel's counsel never even asserted Michael was at fault for his injuries and death. To the contrary, defense counsel described Michael's conduct as follows:

"What else is going on at that time with Michael Zak? He is starting to eat better, and I think we have heard it from just about every witness who knew him in this trial, including Dr. Riffel, he was exercising much, much more, which is also in and of itself good for the heart and good for a heart with left ventricular dysfunction."

In summing up the case for the jury, defense counsel stated:

"I think we can conclude that nobody is at fault here. This was a death that was very unfortunate, tragic. Mr. Zak was taken way before his time, everybody agrees, but is it anybody's fault? . . .

"And my suggestion to you would be that when you go back to the jury room, that you answer question number one, no. No fault; nobody caused Michael Zak's death. That's the most appropriate and the fairest answer based on the evidence."

Clearly Dr. Riffel's trial strategy was to convince the jury that no one was at fault for Michael's death. In any event, whether there was sufficient evidence at trial to support a comparison of fault between Michael and Dr. Riffel is not the issue in this appeal. The real question we must decide is whether Instruction No. 14 adequately apprised the jury of each party's claims and affirmative defenses concerning fault. Regarding Dr. Riffel's contentions, we conclude Instruction No. 14 was fatally defective in two respects. First, Instruction No. 14 failed to specify any allegations of fault on Michael's part. Second, the instruction failed to set forth Dr. Riffel's burden of proof on this issue.

Kathleen's claims against Dr. Riffel were clearly identified in Instruction No. 14. She made three specific allegations of fault against Dr. Riffel. The instruction further informed the jury that Kathleen had the burden to prove that her allegations of fault were more probably true than not true. The instruction did not contain the same information regarding Dr. Riffel's claims, if any, against Michael.

The instruction stated that "defendant asserts that the death of Michael Zak was not the result of, or caused by, any act or omission on the part of this defendant. Instead, the death of Michael Zak was the result of a pre-existing cardiomyopathy that was aggravated by Michael Zak's obesity and lifestyle." At best, this language constituted a claim that Michael's death was *caused* by his obesity and lifestyle. However, causation is only one component of fault. The instruction did not include any specific allegations of fault against Michael which could be compared with the specific allegations of fault that had been made against Dr. Riffel. Although the jury was informed in another instruction that a patient has a duty to follow his or her physician's reasonable treatment advice, the jury was not

given any guidance in the instructions as to what advice Michael failed to follow. This problem was exacerbated by the fact that defense counsel never pointed to any specific allegations of fault against Michael during the closing argument.

More importantly, Instruction No. 14 was fatally defective because it failed to inform the jury that Dr. Riffel shouldered the burden of proof to establish Michael's comparative fault. The trial court instructed the jury that Kathleen had the burden to prove her claims of fault against Dr. Riffel, but Instruction No. 14 never informed the jury that Dr. Riffel had a similar burden to prove any claim of fault against Michael. In another instruction, the jury was informed that "[a] party who has the burden of proof must persuade you that his claim is more probably true than not true." However, this instruction would be meaningless to the jury unless at some point the jury was informed Dr. Riffel had the burden to prove his claims. This important information was not contained anywhere in the entire set of instructions given by the trial court, and this omission resulted in the instructions as a whole being clearly erroneous.

PIK Civ. 3d 106.01 provides that in outlining affirmative defenses, the defendant should "[s]et forth concisely the defendant's specific grounds of negligence that are supported by the evidence." Also, PIK Civ. 3d 106.01 includes a statement that "[t]he defendant has the burden to prove that any of (his) (her) claims of fault on the part of the plaintiff are more probably true than not true." The use of PIK instructions by trial courts is strongly recommended. *State v. Kleypas*, 272 Kan. 894, 1035, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled on other grounds State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004).

Here, Instruction No. 14 did not include specific allegations of Michael's fault, nor did it set forth Dr. Riffel's burden of proof. The instructions as a whole were not substantially correct, and the jury could have reasonably been misled by them. We conclude the trial court committed reversible error in instructing the jury and, as a result, the case must be remanded for a new trial. Upon retrial, we make no determination whether Michael's alleged fault can be compared with Dr. Riffel's. That will depend on the evidence pre-

sented at trial. However, an assertion of fault based only upon Michael's "obesity and lifestyle" would be legally deficient because that is what required Michael to seek medical care in the first place. Furthermore, if fault is to be compared, the trial court must correctly instruct the jury on the specific claims of fault by each party and the respective burdens of proof pursuant to PIK Civ. 3d 106.01.

### Collateral source benefit

Kathleen also claims the trial court erred by admitting evidence of a $262,500 payment by BHA Group after Michael's death because the admission of the evidence violated the collateral source rule. The trial court admitted the evidence for the limited purpose of laying a foundation for the defense to cross-examine Dr. Ward about his report. We will address this issue because it is likely to be raised upon a retrial of the case.

Generally, the admission of evidence lies within the sound discretion of the trial court. An appellate court's standard of review regarding a trial court's admission of evidence is abuse of discretion. *Wendt v. University of Kansas Med. Center*, 274 Kan. 966, 975, 59 P.3d 325 (2002). An abuse of discretion must be shown by the party attacking the evidentiary ruling and exists only when no reasonable person would take the view adopted by the trial court. *Jenkins v. T.S.I. Holdings, Inc.*, 268 Kan. 623, 633-34, 1 P.3d 891 (2000). However, an abuse of discretion has occurred where the trial court clearly erred or ventured beyond the limits of permissible choice under the circumstances. *Unwitting Victim v. C.S.*, 273 Kan. 937, 944, 47 P.3d 392 (2002).

" 'The collateral source rule provides that benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer.' " *Farley v. Engelken*, 241 Kan. 663, 666, 740 P.2d 1058 (1987) (quoting *Allman v. Holleman*, 233 Kan. 781, Syl. ¶ 8, 667 P.2d 296 [1983]). The purpose of the collateral source rule is to prevent the tortfeasor from escaping full liability resulting from his or her actions by requiring the tortfeasor to compensate the injured party for all of the harm, not just the net loss. *Rose v.*

*Via Christi Health System, Inc.,* 276 Kan. 539, 544, 78 P.3d 798 (2003), *modified on rehearing* 279 Kan. 523, 113 P.3d 241 (2005).

"A benefit secured by the injured party either through insurance contracts, *advantageous employment arrangements,* or gratuity from family or friends should not benefit the tortfeasor by reducing his or her liability for damages. If there is to be a windfall, it should benefit the injured party rather than the tortfeasor." (Emphasis added.) 276 Kan. at 544.

Dr. Riffel disputes the fact that the $262,500 payment from BHA Group to Kathleen constituted a collateral source payment and claims this was a factual issue for the jury to decide. He argues BHA Group's promise that Michael's salary would be continued for 1 year from the date of his death indicated that the payment was compensation to Michael rather than a death benefit. He also points to the fact that the payment was recorded in the company books as a payment from a "bonus account," to which payments of cash bonuses to employees were ascribed.

However, it was the trial court's function to determine whether the payment received by Kathleen constituted collateral source evidence. The testimony established that both BHA Group and Kathleen considered the payment to be a death benefit. It was irrelevant whether the payment was based upon BHA Group's promise to continue Michael's salary for 1 year from the date of his death. Even if this evidence is taken at face value, it was apparent that the payment was not compensation earned by Michael during his lifetime. Rather, it was a benefit paid upon his death. Furthermore, it was irrelevant whether the payment was voluntary or an obligation. The collateral source rule applies to payments received gratuitously as well as those received as a result of an obligation. *Johnson v. Baker,* 11 Kan. App. 2d 274, 278, 719 P.2d 752 (1986). The evidence was undisputed that the $262,500 payment was a death benefit received by Kathleen as a result of an advantageous employment arrangement between BHA Group and Michael. This constituted inadmissible collateral source evidence as a matter of law. See *Rose,* 276, Kan. at 544.

Dr. Riffel also asserts that the evidence of the $262,500 payment was admissible to impeach the credibility of Dr. Ward because he had failed to account for the payment in his damages calculations.

According to Dr. Riffel, this omission provided evidence that Dr. Ward's calculations were biased and not credible.

Dr. Riffel is correct in asserting that although evidence of a collateral source payment is generally inadmissible as a matter of law, such evidence may be admissible if it " 'carries probative value on an issue not inherently related to measurement of damages.' [Citation omitted.]" *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 515, 701 P.2d 939 (1985). Apparently the trial court adopted this reasoning when it ruled that evidence of the $262,500 payment would be admissible for the limited purpose of laying a foundation for the defense to impeach Dr. Ward.

Prior to allowing the jury to hear evidence of the $262,500 payment, the trial judge gave the following limiting instruction to the jury:

"Members of the jury, we are about to receive some evidence which is going to be received for a limited purpose only. This is evidence concerning some compensation that was paid by Mr. Zak's employer to Ms. Zak as his surviving spouse, and this evidence is being introduced, and I'm permitting it to be introduced solely for the purpose of being used in examination of an expert witness that's going to testify tomorrow, *and it will become apparent which expert witness and what . . . [it's] being considered for when it happens.*

"This evidence is not being admitted for the purpose of permitting you to understand or in any way diminish or reduce the economic losses suffered by Ms. Zak, if any, as a result of Mr. Zak's death due to the negligence of the defendant.

"In other words, later in this case you are going to have to determine the amount of damages that the plaintiff has suffered because of the negligence of the defendant and to the extent that you determine those amounts, this evidence is not being offered. It's being offered but not being received for the purpose of using that to reduce or to diminish the amount of damages that you may find Ms. Zak may be recovering.

"It's only being used and received for the purpose of laying a foundation for some questions and calculations made by an expert witness who is going to testify presumably tomorrow, and so you are to consider it, and remember that it's being received only for that purpose." (Emphasis added.)

After evidence regarding the payment was presented to the jury, the trial judge again admonished the jury:

"Members of the jury, these two exhibits that we have just been talking about, Exhibits 139 and 140, were received in evidence by me earlier this afternoon for the limited purposes that I have talked about before. They are merely being

introduced for the purpose of laying a foundation to determine some calculations that have been made by an expert witness who will testify tomorrow. They are not received for the purpose of presenting evidence to diminish the amount of economic loss, if any, that the plaintiff has suffered as a result of the defendant's negligence."

The problem in this case is that the limited purpose for which the trial court admitted the collateral source evidence never became clear to the jury. After successfully convincing the trial court that the evidence of the payment should be admitted for the limited purpose of impeaching Dr. Ward, defense counsel failed to use the evidence for this purpose. Dr. Ward was never cross-examined about the $262,500 payment. After evidence of the payment was initially presented to the jury, the subject was not addressed throughout the remainder of the trial. Although the trial court had admonished the jury that it was hearing the evidence for a limited purpose that would "become apparent" in later testimony, no evidence was ever presented for the jury to make a connection. The jury could only have been confused by the limiting instruction given by the court.

Furthermore, the evidence of the $262,500 payment had no probative value on any issue other than the measurement of damages. As previously discussed, the question of whether the payment was compensation or a death benefit was not a factual issue for the jury to decide. The payment was collateral source evidence as a matter of law. Dr. Ward was correct in not including the payment in his calculations, and his failure to do so could not have properly been used to show bias by Dr. Ward. Thus, although collateral source evidence may be admissible in certain instances if relevant to an issue other than the measurement of damages, this case does not present such an instance.

Finally, Dr. Riffel argues that Kathleen should have filed a motion to strike the testimony regarding the $262,500 payment once Dr. Ward was not cross-examined on the issue. However, the burden was not on Kathleen to file such a motion, and it may have only caused further prejudice by reemphasizing the collateral source evidence. Furthermore, Instruction No. 5A, which instructed the jury that evidence admitted for one purpose should

not be considered for any other purpose, did not cure the error because the limited purpose that the evidence was admitted in this case never became clear to the jury.

We conclude the $262,500 payment from BHA Group to Kathleen constituted inadmissible collateral source evidence as a matter of law. The trial court abused its discretion in admitting this evidence. Upon retrial, the evidence should not be admitted even for the limited purpose of impeaching Dr. Ward.

We recognize that Kathleen has raised other significant issues on appeal. Because we are already remanding this case for a new trial, we will not address the remaining issues.

Reversed and remanded.