NOT DESIGNATED FOR PUBLICATION

No. 118,656

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BLIZZARD ENERGY, INC.,
*Appellee/Cross-appellant*,

v.

VALENTIN ALEXANDROV, JACOB GITMAN and
BERND SCHAEFERS,
*Appellants/Cross-appellees,*

v.

FRANZISKA SHEPARD,
*Appellee/Cross-appellant.*


MEMORANDUM OPINION

Appeal from Barton District Court; STEVEN E. JOHNSON, judge. Opinion filed April 19, 2019. Affirmed in part and dismissed in part.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellants/cross-appellees.

*Jeffrey R. King*, of Post Anderson Layton Heffner, LLP, of Overland Park, for appellees/cross-appellants.

Before BRUNS, P.J., MALONE and POWELL, JJ.

PER CURIAM:  After an eight-day trial, a jury found that defendants Bernd Schaefers, Valentin Alexandrov, and Jacob Gitman had committed fraud upon Blizzard Energy, Inc. (Blizzard) and Franziska Shepard; it awarded Blizzard and Shepard

1

$3,825,000. Schaefers, Alexandrov, and Gitman appeal, arguing: (1) there was insufficient evidence to sustain a fraud claim against them; (2) there was insufficient evidence to support the finding that Gitman personally committed fraud; and (3) inconsistency in the jury verdicts requires a new trial. Shepard and Blizzard cross-appeal, arguing that the district court erred in dismissing their shared claim of negligent misrepresentation and asking this court, if it grants a new trial, to reinstate that claim. For the reasons stated in this opinion, we affirm the district court's judgment and dismiss the cross-appeal as moot.

FACTUAL AND PROCEDURAL BACKGROUND

*Background*

Schaefers was born in Germany and moved to the United States permanently in about 1995. German was his native language, but he also spoke English. In 2005 or 2006, Schaefers met American businessman David Baskett and began investing in Baskett's companies and otherwise working with him. Baskett eventually gave Schaefers ownership shares in two of his companies: TTE International (TTE), which did business with the American military, and International Emergency Services (IES), which was intended to develop and offer amphibious airplanes for fighting wildfires.

In 2010, Schaefers moved to Santa Maria, California, where he lived with and worked alongside Baskett and engineer Dick Hulme until 2014 or early 2015; the men worked out of a building Baskett owned. In 2010 or 2011, Schaefers met Franziska Shepard, whose husband was a former investment partner with Baskett. Shepard was a native of Austria, but she had lived in the United States since 1958 and in California since 1967. Shepard was a successful entrepreneur and had invested since the early 1970s in projects, including manufacturing dollhouses, developing breast implants, building

2

offices, building residential and assisted living care for senior citizens, and other real estate endeavors.

In April 2011, Alexandrov began working in Baskett's office space and assisting Baskett on a project involving firefighting aviation. Alexandrov had been born in Kiev, and his native language was Ukrainian, but he also spoke English, some German, and "basic Arabic." After resigning from the Russian military in 1994, Alexandrov came to the United States, where he worked for Coca-Cola and obtained his master of business administration degree. After graduation, Alexandrov cold-called companies known to do business with Russians, and in that context he met Baskett. Although Alexandrov and Baskett had only occasional contact over the next 13 years, Alexandrov began working in Baskett's office space in 2011, and that is where he met Schaefers. Baskett did not pay Alexandrov for his work, but he gave him shares in TTE and IES.

That summer, Alexandrov and Baskett attended a firefighting conference in Idaho, where they met Gitman. Gitman was born in the Soviet Union and spoke fluent Russian, Ukrainian, and Kyrgyzstan, in addition to English and a little Turkish, Polish, Spanish, and Portuguese. Gitman held a degree in mining engineering and a degree in physics of solids from a school in Moscow, and he had been a professional engineer in Russia. Gitman had lived in the United States since 1990 or 1991.

During a break in the firefighting conference, Gitman told Alexandrov and Baskett that he partly owned an operating pyrolysis plant in Crimea, Ukraine, and he had extensive knowledge about pyrolysis. Pyrolysis is the process by which feedstock is brought to a high temperature without oxygen and transformed into another product. More specifically, tire pyrolysis—which uses scrap tires or waste tires as feedstock— anaerobically heats tires until they decompose. The vapors created in this process are funneled through a pipe into other equipment where they cool and condense, while the carbon and wire are left in the crucible. Some hydrocarbon vapor condenses into a liquid,

3

which is called pyrolysis oil, and what does not condense is syngas, which is used as part of the fuel for the furnaces. Once the furnace cools and pyrolysis is complete, a carbon black system separates the wire in the tires from the carbon, which is ground to make carbon black. According to Gitman, his Crimea plant converted tires into gasoline, diesel fuel, and heating oil.

The three men "had a couple of dinners together" and decided that Gitman was a "concept guy," while Alexandrov and Baskett were "business people." Believing they would make a good team, they decided to cooperate in a pyrolysis business venture in the United States. Gitman emailed Alexandrov additional information about pyrolysis and Alexandrov began to educate himself, looking for scrap tires and researching pyrolysis equipment manufacturers around the world. Gitman did not send Alexandrov any documents describing exactly how the pyrolysis process worked, and he did not send any plant design documents. Alexandrov later testified that he learned that pyrolysis had been used in the 1990s, but all the pyrolysis plants in the United States went bankrupt because they were not using tires as the feedstock.

Using some of the information and photographs of the Crimea plant he had received from Gitman, as well as information he found through his research, Alexandrov prepared a PowerPoint presentation (the Presentation) about the tire pyrolysis proposal; he took the presentation to a Clean Business Investment Summit (the Summit) in Santa Barbara, California, on August 12, 2011, with the intent of soliciting investors for their tires-to-fuel project. Schaefers gave Alexandrov information to put into the presentation and he eventually reviewed the presentation, but not thoroughly. Similarly, Gitman looked at the financial information in the Presentation but he didn't review it as "Alexandrov put it together." Around the time of the Summit, Schaefers met Gitman.

On August 15, 2011, TTE International—of which Baskett, Schaefers, and Alexandrov were all shareholders—entered into a 50/50 partnership agreement with

4

Gitman's company, Agro-Energy, to develop a pyrolysis plant in the United States. This joint venture was called California Renewable Energy Center, LLC (CREC), because they planned to build and operate the plant in California.

*Shepard invests*

After the Summit, Baskett suggested Shepard as a possible investor for the Project. Accordingly, Schaefers, Alexandrov, Gitman, and Baskett approached Shepard in August 2011 in the hopes she would invest in their concept of converting scrap tires into fuel through pyrolysis. According to Alexandrov, they told Shepard that "the technology [they] had to offer through Mr. Gitman was something new and different that [there was a good possibility] would make it profitable in the U.S." Schaefers also spoke with Shepard on the phone, and Baskett provided her with additional information about the anticipated pyrolysis project. Specifically, Shepard received a copy of the Presentation, which she sent to her longtime attorney, George Tomlinson, and her longtime accountant, Jeanne Potter, for their review.

Among other things, the Presentation identified Agro-Energy and TTE International, Inc. as the joint venture partners in CREC. It identified the "management" as Gitman, Baskett, Alexandrov, and Schaefers, who was described as a "veteran entrepreneur with 20 years of expertise in the renewable energy sector." The presentation stated that it sought "needed funding" of $3,750,000 total, including $2,500,000 for "capital equipment"; $900,000 for "working capital"; and $350,000 for "site launch." The Presentation identified revenue sources as gasoline, steel, carbon black, and electricity, and it asserted that "[o]ne average size tire [equals] 1.3 gallon[s] of fuel," and "there is no limit for business expansion with our competitive pricing." In fact, the Presentation projected $4,000,000 in revenue per year with a net profit of $1,700,000 per year. The final page of the Presentation was a "Project Timeline" that showed three months for

5

design and construction of the site, four months for equipment procurement and fabrication, six months for plant assembly, and then startup and testing.

On August 25, 2011, Shepard met with Baskett and Alexandrov and agreed to proceed with the tire pyrolysis project and begin forming a new legal entity for the business venture. Shepard later testified, however, that she did not at that time "fully agree[] to invest completely in the project"; rather, she was willing to explore the idea further, based on the proposal that she would fund the pyrolysis plant and the defendants would provide the necessary technology and engineering. Similarly, Tomlinson later testified extensively about his part in the ongoing negotiations over the various parties' roles and responsibilities in the pyrolysis project. In any event, throughout the remainder of 2011, the parties continued their negotiations and their attempts to define the parameters of the project and their roles therein.

For example, in November 2011, Shepard requested and received a proposed business plan called Tires to Fuel Colorado (TTFC) which, as proposed, would "build[] initially one, and after successful implementation, a series of waste recycling plants, first concentrating on waste tires[.]" By this point, the geographical focus of the project had moved from California to Colorado, and the proposed business plan identified two initial site options in Colorado and represented that "Colorado has the largest stockpiles of waste tires in the USA." Shepard refused to sign off on that proposed business plan, and the parties could not agree upon a business structure for an entity to develop the project or on the proportion of each party's ownership of that entity.

Meanwhile, in late 2011 or early 2012, while researching tire landfills in Colorado, Alexandrov discovered that Twylia and Marvin Sekavec, who owned a small tire landfill in Colorado, also owned a much larger tire landfill in Brownell, Kansas. Alexandrov and Schaefers came to Kansas and stayed with the Sekavecs, who ultimately

6

agreed to provide their scrap tires for the project. Thus, the geographical focus of the project again shifted, this time to Kansas.

Eventually, Shepard decided that before investing in the project, she wanted to travel to Russia and view the equipment used in tire pyrolysis. Accordingly, in late January 2012 and early February 2012, Alexandrov, Schaefers, Shepard, and Gitman traveled to Russia, along with Joseph Lastella and Oleg Svabsky. Svabsky was a Ukrainian-educated, -trained, and -certified mechanical and electrical engineer with whom Gitman had worked and who he brought into the project. Lastella was a retired, formerly-licensed-in-the-United-States, American engineer with many years of experience whom Schaefers had suggested accompany them to Russia to "look at equipment and see whether he thought that the manufacturing like welding seams and quality of steel and so on . . . would be acceptable." During the Russia trip, the group took samples of the end-products at both plants, which were later tested in certified and licensed United States laboratories. Alexandrov told Shepard that the test results were positive, meaning they were encouraging.

The parties' later descriptions of the trip vary, but they visited two pyrolysis plants, including a plant owned by Zhelezno, the company that later sold them the equipment for their pyrolysis plant. Shepard paid the travel expenses for herself, Alexandrov, Schaefers, and either Svabsky or Lastella—which engineer accompanied them on the trip is unclear. Similarly, after August 2011, Shepard paid for at least some of Schaefers' expenses for travelling to search for scrap tires and a building site.

The parties never signed a written contract about the pyrolysis project, but on March 21, 2012, Shepard filed articles of incorporation for Blizzard with the Kansas Secretary of State's Office. Those articles identified Shepard as Blizzard's sole shareholder. On May 12, 2012, the parties signed a contract to purchase pyrolysis

equipment from Zhelezno, and Shepard began disbursing money to pay for equipment. All the capital investment money for the pyrolysis project ultimately came from Shepard.

The parties' versions of the events underlying this case vary wildly and are not easily ascertainable from the record. For example, Schaefers maintains that he and Shepard had a meeting on December 23, 2011, at which they agreed—through a "handshake deal"—that Shepard would receive 50 percent ownership in the project, leaving 50 percent to be split between Alexandrov, Baskett, Schaefers, and Gitman. Shepard adamantly denies that this meeting occurred. They also disagreed over who was responsible for ordering pyrolysis equipment from Russian manufacturers, who was responsible for delays in the permitting process, and who was responsible for difficulties obtaining a Kansas site on which to construct the pyrolysis plant. For purposes of the present appeal, it suffices to say that as time went on, Shepard became unhappy with the progression of the project compared to the amount of money she was spending. Additional facts are provided in the analysis section below as needed.

Shepard's husband experienced serious health problems beginning in May 2012, which she alleged occupied most of her attention and time. In May 2013, when her husband had recovered, Shepard began to ask more questions about the progress of the project, and she learned that the applications for Kansas permits and a required EPA permit had not been completed, there were no engineering drawings of the type required to be submitted with permit applications, the Kansas warehouse Blizzard had purchased was undeveloped and dirty, and the equipment that had been delivered from Russia was unusable without retrofitting. Shepard felt that the failure to obtain the permits was inconsistent with the timeline that had been represented to her; she was displeased with the expense anticipated to bring the equipment into code compliance; and she felt that many representations made to her were not being actualized, including estimated timelines on the plant becoming operative.

8

Accordingly, in August 2013, when the plant was still not operational, Shepard informed Schaefers that she was no longer involved with Blizzard or the pyrolysis project. Alexandrov disputed the assertion that Shepard similarly terminated him from the project. He asserts that on September 3, 2013, Shepard gave him a deadline to choose between Schaefers and her. Alexandrov did not respond by the deadline, so they parted ways. In any event, Alexandrov, Gitman, and Schaefers ended their formal relationship with Blizzard in August and September 2013.

*Legal proceedings*

On February 13, 2015, Alexandrov, Gitman, and Schaefers sued Shepard and Blizzard in California state court, alleging "1) breach of fiduciary duty; 2) constructive fraud; 3) conversion; 4) breach of oral agreement; 5) declaratory relief; 6) accounting; 7) imposition of resulting trust; and 8) imposition of constructive trust." They sought compensatory damages, disgorgement, constructive and resulting trusts, an equitable lien, an accounting, and punitive damages. On March 19, 2015, they dismissed their claims against Blizzard.

While that case was proceeding in California, Blizzard sued Alexandrov, Gitman, and Schaefers in Kansas state court, alleging against them collectively claims of (1) fraudulent inducement, concealment, and/or representation, or negligent misrepresentation; (2) breach of oral contract; (3) violating the Kansas Uniform Trade Secrets Act; and (4) conversion. Blizzard sought injunctive relief, the return to Blizzard of certain schematic designs, money damages, attorney fees, costs, and expenses.

Schaefers and Alexandrov separately responded pro se to the Kansas action, but both purported to name Shepard as a third-party defendant; both brought counterclaims and third-party claims against Blizzard and Shepard respectively for breach of fiduciary duty, constructive fraud, conversion, unjust enrichment, and bad faith misappropriation;

9

and both brought third-party claims against Shepard individually for breach of oral agreement and defamation. Alexandrov and Schaefers also both sought declaratory judgment (1) dissolving any partnership between themselves, Shepard, and Blizzard; (2) recognizing that they each hold a 12.5 percent ownership interest in Blizzard and/or the Blizzard pyrolysis project; and (3) recognizing that they each hold a 12.5 percent ownership interest in any profits of Blizzard and/or the pyrolysis project since its inception. In addition to the declaratory judgment, they requested monetary damages, dismissal of Blizzard's Kansas petition, injunctive relief, back pay, attorney fees, costs, and expenses. Blizzard filed its answer and affirmative defenses to the counterclaims.

In December 2015, the Kansas district court ordered the parties to show cause why this case should not be dismissed as a matter of comity since it appeared that litigation was already proceeding in California. In response, Blizzard informed the district that the California case had been dismissed in July 2015 on the basis of forum non conveniens. Blizzard attached to its response the California state district court order dismissing the California action "without prejudice to [Alexandrov, Gitman, and Schaefers] pursuing an action in the District Court for Barton County, Kansas, should they so desire." The Kansas court retained the case.

Thereafter, on December 30, 2015, with the district court's permission, Gitman filed an untimely pro se answer to Blizzard's petition. Although Gitman, Schaefers, and Alexandrov continued throughout trial to represent themselves pro se and file individual motions when required, their arguments were generally united. Thus, they collectively are referred to hereinafter as Defendants unless assessment of individual positions or arguments is necessary.

In February 2016, the district court granted Defendants' motions to join Shepard as a third-party defendant. Shepard filed her answers to the claims against her, and she asserted third-party counterclaims against Defendants for (1) "fraudulent inducement,

10

concealment, and/or misrepresentation, or negligent misrepresentation"; and (2) securities fraud. Shepard sought monetary damages of over $1 million. Blizzard amended its petition to add a claim of unjust enrichment and to remove its claim of breach of oral contract; Shepard later removed her securities fraud claim.

At a motions hearing on February 24, 2017, the district court granted summary judgment against Defendants on their claims of libel and granted dismissal of all claims of fraud in the inducement, as well as any "cause of action for any type of fiduciary relationship here." The written journal entry from that motions hearing reflected that the district court had granted summary judgment in favor of Blizzard and Shepard on the claims against them for breach of fiduciary duty, constructive fraud, and conversion and had dismissed Blizzard's and Shepard's claims for fraudulent inducement. Accordingly, the claims that went to trial were (1) Blizzard and Shepard's claims of "fraudulent inducement, concealment, and/or misrepresentation, or negligent misrepresentation"; (2) Blizzard's claim of unjust enrichment; and (3) Defendants' claims against Shepard for (a) breach of joint venture and (b) unjust enrichment.

*Jury trial*

The jury trial began on Monday, June 12, 2017, with voir dire and opening arguments. Over the rest of the first week of the trial, Blizzard and Shepard, who are collectively referred to hereinafter as Plaintiffs, presented their case to the jury. Plaintiffs' trial strategy appeared to be pointing out to the jury all of the multitude of statements and representations Shepard claims Defendants made to her from their first meeting in August 2011 through the termination of their business relationship in August or September 2013, including alleged misrepresentations or untruths in the Presentation. Plaintiffs characterized the Defendants as having "planned and schemed to utilize [Shepard's] money to develop a technology to convert tires to fuel" with the intent to "take it on the road . . . where they could make money off the technology that [Shepard] paid for."

11

Plaintiffs asserted that Defendants represented that they already had the necessary technology, but they did not. In addition, Plaintiffs argued that Defendants lied about the cost of the project, lied about their competence, lied about their experience, lied about the expected output from pyrolysis, lied about anticipated revenue, lied about the timeline to production, and lied about the expected profit.

Plaintiffs presented testimony from Schaefers; Alexandrov; Gitman; Shepard; Tomlinson; Great Bend building inspector Lee Schneider; and consulting engineer Charles Schneider, whom Shepard hired after she removed Defendants from Blizzard, and who testified extensively about the safety hazards posed by the pyrolysis equipment in the state it was delivered from Russia and the cost of bringing that equipment up to code. Plaintiffs also played for the jury a video recording of the 2016 deposition of Ethan Begg, a professional engineer who was retained by Blizzard in August 2012 to guide Blizzard through the Kansas air and waste management permitting process. Along with his interactions with Blizzard through that process, Begg also testified about the time he worked for Blizzard and his impression that Schaefers was not experienced in drafting contracts or in permitting.

Plaintiffs also presented testimony from Dr. Richard J. Lee, a physicist. Lee and his company, RJ Lee Group, had been involved in tire pyrolysis since about 2000 and, in 2007 or 2008, a subsidiary of RJ Lee Group had successfully commercialized a tire pyrolysis process that they had developed. RJ Lee Group holds six patents involving tire pyrolysis. Lee explained that he was not the first person to try tire pyrolysis in the United States and that, when he began investigating tire pyrolysis, about 70 patents had been filed related to tire pyrolysis, and 50 to 75 tire pyrolysis companies had started, two or three of which produced product qualified for commercial use. He also testified that it was not reasonable to represent that a pyrolysis plant could be brought from theory to operation with commercial sales within 9 or 10 months; he believed that "time line's off by somewhere between one and two years."

12

Lee opined that it was not a realistic representation to assert that the second year of operation would bring a $1.9 million profit; rather, "they'll be lucky if they're [paying their expenses] at the end of the second year." He also asserted that the November 2011 proposed business plan did not "accurately represent the types and quality of products that could be produced by the plant." He testified that the financial projections provided in that business plan and other associated documents were not at all reasonable, and the timelines provided were not realistic. After Lee's testimony, Plaintiffs rested their case.

When the trial resumed on Monday, June 19, 2017, Defendants called Shepard; Gitman and Alexandrov also testified again. Over the next three days, Defendants told the jury their version of events, which was that Shepard had provided capital to develop the pyrolysis process with the promise of 50/50 ownership in the pyrolysis project, and she investigated for nine months before investing any capital. Defendants argued that as a savvy businesswoman, Shepard understood that there was an inherent risk in the project, they had communicated with her honestly throughout the process, and her claims that she had been misled were lies.

Defendants also presented testimony from their expert, Anthony Cangelosi, an experienced appraiser who had conducted business valuations and financial forensic evaluations for more than 15 years. Cangelosi testified that as of August 31, 2013, he valued Blizzard at $10,810,000, and he explained the process by which he came to that valuation. Defendants also presented a forensic expert, Larry Stewart, who testified that a signature on one of the documents submitted into evidence by Plaintiffs appeared to have been forged using another document. This forgery testimony was apparently presented to show the jury that Plaintiffs were untrustworthy and not credible.

Defendants rested their case and, during the jury instruction conference, the district court dismissed Plaintiffs' negligent misrepresentation claim. The parties agreed on jury instructions, and the claims were submitted to the jury at 11:21 a.m. on June 22,

13

2017. At 3:55 p.m., the jury rendered its verdict: it found in Plaintiffs' favor on Plaintiffs' fraud claims, and awarded Plaintiffs $3,825,000 in actual damages. The jury rejected Blizzard's claim for unjust enrichment and the defendants' claims against Shepard for breach of joint venture and unjust enrichment.

On July 12, 2017, Michael Whalen filed an entry of appearance as counsel for Defendants. On July 29, 2017, Defendants filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial on the fraud claims against them. The motion concentrated on the special verdict form, arguing that inconsistencies in the jury's answers required granting the motion. Specifically, the jury answered "yes" to question A(1), which asked whether Defendants "committed fraudulent acts by concealment or representation against Blizzard and Ms. Shepard," but answered "no" to question A(4), which asked whether "the conduct of [Defendants] in committing fraudulent concealment or fraudulent representation was willful, fraudulent, or malicious." Blizzard and Shepard opposed the motion for judgment notwithstanding the verdict.

On July 31, 2017, the district court filed an approved journal entry of judgment but ordered the judgment stayed until the posttrial motions could be resolved. On September 11, 2017, the district court held a hearing on the posttrial motions. Defendants asserted their inconsistent verdict argument and argued that there was insufficient evidence to support the fraud verdict. Plaintiffs disagreed. On September 14, 2017, the district court filed its journal entry denying Defendants' posttrial motions. Defendants timely appealed, and Plaintiffs timely cross-appealed.

WAS THERE SUFFICIENT EVIDENCE OF FRAUD BY THE DEFENDANTS?

Defendants argue that there was insufficient evidence to support the jury's verdict that they had committed fraud. A claim of fraud "'must be established by clear and convincing evidence." *Bank of America v. Narula*, 46 Kan. App. 2d 142, 158, 261 P.3d

14

898 (2011). "'The elements of fraud are "an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment."'" *In re Marriage of Kidane and Araya*, 53 Kan. App. 2d 341, 346, 389 P.3d 212 (2017).

The extremely broad nature of the asserted basis for Plaintiffs' fraud claim is evident from the jury instructions:

"A. For their claims of Fraudulent Concealment and/or Representation against Defendants, Blizzard and Ms. Shepard allege:

"1. In their oral and written communications with Ms. Shepard both before and after the formation of Blizzard, Mr. Alexandrov, Mr. Gitman, and Mr. Schaefers each made false representations to Ms. Shepard regarding:

- The types, quality, quantity, and value of products that could be produced by the pyrolysis plant they proposed;
- Their experience, competence, ability, skill, and knowledge in the development, engineering, construction, start-up, and operation of a tire pyrolysis plant and its processes;
- The results of the laboratory tests performed on samples of products allegedly produced by plants using similar equipment in the Ukraine and Russia;
- The profitability of the proposed plant;
- The time frame within which the proposed plant would receive all necessary permits, be assembled and constructed, and become operational; and
- The nature of the equipment they suggested be purchased for the plant and whether that equipment would be capable of becoming operational and in compliance with applicable codes and regulations.

"2. Many of these representations were contained in the Business Plan dated November 2011 that Defendants provided to Ms. Shepard. Defendants knew these representations were false, made them intentionally and/or recklessly without knowledge of their truth, or made them without exercising reasonable care as to their truth.

15

"3. Defendants also concealed material information from Ms. Shepard with actual knowledge that the information was not within Ms. Shepard's knowledge or ability to discover.

"4. Moreover, Defendants made false representations to Ms. Shepard, and concealed material information from Ms. Shepard, regarding the companies and contractors they suggested Blizzard use to supply certain equipment and/or services.

"5. Defendants made these false representations and material concealments with the intent of causing Ms. Shepard and then Blizzard to pursue, invest in, and fund the construction of the pyrolysis plant, and they also sought to profit personally from Blizzard's use of the companies and contractors they suggested.

"6. In reliance on Defendants' representations, Ms. Shepard formed Blizzard and invested millions of dollars into Blizzard, part of which Blizzard then spent for the purchase of certain equipment and use of certain contractors for the construction of the plant. Ms. Shepard and Blizzard otherwise would not have done so had Ms. Shepard known the full truth of the representations made to her by Defendants.

"7. Blizzard and Ms. Shepard are seeking damages jointly and severally from Defendants for $2,202,659.36 invested in Blizzard by Ms. Shepard and spent by Blizzard as of September 2013 (the time that Ms. Shepard advised Defendants that they were no longer to be involved with Blizzard). Blizzard and Ms. Shepard also are seeking as damages $3,701,474.95 spent by Blizzard from September 2013 to the present on contractors to redesign and modify the equipment purchased at Defendants' instruction, and on additional equipment and materials, in order to make the plant functional, operational, and in compliance with applicable codes and regulations. Moreover, Blizzard and Ms. Shepard are seeking punitive damages for Defendants' willful, wanton, fraudulent, or malicious conduct."

Similarly, in closing argument, Plaintiffs asserted: "They told her they had technology they didn't have, that they could do something that they couldn't do, when they could do it, how they could do it, what it would cost to do, and all of those things were wrong." Plaintiffs identified various instances they characterized as misrepresentations, and they referred specifically to the Presentation Defendants gave to Shepard in August 2011:

16

"[Defendants] said they had proven technology and engineering expertise with Mr. Gitman's company, and then they had all this successful business development management experience. . . . [T]hey testified that all these members had lots and lots of experience. As you saw, I poked holes in Mr. Schaefers' experience. It's very little, and he's never made a dime for anything regarding the renewable energy sector. We talked about Mr. Gitman's real experience and so on.

"Next page, Page 8, produces high quality fuel. Well, I think you guys all know about that as well as these other things that it supposedly could do. Page 9, all they needed was 3.75 million. Clearly, that's not what ultimately happened. Page 11, produces gasoline carbon black. Well, no. Page 10, . . . [o]ne tire produces 1.3 gallons of fuel. You know, they just sucked that off the internet.

". . . [T]hen let's go to the revenue representations. They say, you know, [Shepard], if you would just invest in this company, you could get revenue of four million dollars a year based on gasoline at $3.30 a gallon. Well, there's no way they can produce any of this, and then the ridiculous time frame that they talked about how fast they could get it up and the chart that shows the timing, which is that chart right there, also couldn't be done."

Plaintiffs also directed the jury to the proposed business plan Defendants had sent to Shepard; Plaintiffs emphasized that "the most important deception of all" was Defendants' claim that they had "technology" to make the project work. Plaintiffs pointed out that Defendants presented no expert to explain or identify that "technology," while Plaintiffs presented experts who testified "it's absolutely not possible to do what [Defendants] claimed. It is not scientifically possible to do what they claimed."

"'When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of the appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal.' [Citations omitted.]" *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011).

17

The jury was instructed on a misrepresentation theory of fraud and a theory of fraud through silence:

"Instruction No. 8[:]

"The essential elements required to sustain an action for fraud are:

"1. That false or untrue representations were made as a statement of existing and material fact.

"2. That the representations were known to be false or untrue by the party making them, or were recklessly made without knowledge concerning them.

"3. That the representations were intentionally made for the purpose of inducing another party to act upon them.

"4. That the other party reasonably relied and acted upon the representations made.

"5. That the other party sustained damage by relying upon them.

"A representation is material when it relates to some matter that is so substantial as to influence the party to whom it was made."

"Instruction No. 9[:]

"The plaintiff claims fraud through silence on the part of the defendant. To constitute fraud by silence the plaintiff must prove:

"1. The defendant has knowledge of material facts which plaintiff did not have and which the plaintiff could not have discovered by the exercise of reasonable diligence;

"2. The defendant was under an obligation to communicate the material facts to the plaintiff;

"3. The defendant intentionally failed to communicate to plaintiff the material facts;

"4. The plaintiff justifiably relied upon the defendant to communicate the material facts to the plaintiff; and

"5. The plaintiff sustained damages as a result of the defendant's failure to communicate this to the plaintiff.

"A fact is material if it is one to which a reasonable [wo]man would attach importance in determining her choice of action in the transaction in question.

18

"A party is justified in relying without investigation upon another to communicate the facts material to a transaction unless she knows or has reason to know of facts which make her reliance unreasonable[.]"

As stated above, the jury found in Plaintiffs' favor on their fraud claim, and Defendants now challenge that verdict. Defendants contend that there was insufficient evidence that Plaintiffs justifiably and reasonably relied on any claims by Defendants, and that the evidence, especially Shepard's business experience, demonstrates that Plaintiffs assumed any risk of investing in the project. In response, Plaintiffs argue that there was sufficient evidence to support the jury's finding of fraud.

At trial, Plaintiffs identified countless statements they asserted could support their fraud claim against Defendants. Defendants now ask this court to reweigh the evidence against them as it relates to some of these statements. But this court does not reweigh evidence and it need not examine the viability of every possible statement from which the jury could have found fraud. Instead, this court must affirm if substantial competent evidence presented at trial shows that Shepard, in investing in the pyrolysis project, justifiably relied on *any* untrue statement of material fact made by Defendants; that Defendants knew that statement was untrue and made it with the intent to deceive Shepard or they made the statement with reckless disregard for the truth; and Shepard's reliance led her to act to her detriment. See *In re Marriage of Kidane and Araya*, 53 Kan. App. 2d at 346 (setting forth elements of fraud). Moreover, during this review, this court must view the evidence in the light most favorable to Plaintiffs and draw all reasonable inferences in their favor.

In 2011, Alexandrov prepared the Presentation based in part on his own knowledge and in part on information he gathered from Schaefers and Gitman, and Schaefers reviewed the Presentation. Schaefers understood that the purpose of Alexandrov attending the Summit was to solicit investors for a tires-to-fuel project. After

19

the Summit in August 2011, Baskett told Alexandrov that Shepard might be interested in the pyrolysis project, so Alexandrov sent her an email; attached to the email was the Presentation, "maybe with some small changes." The Presentation was admitted into evidence at trial and referred to extensively.

The Presentation included the assertion "The team members have strong strategic and operational experience across different sectors," and it specifically represented that Schaefers was a "veteran entrepreneur with 20 years of expertise in the renewable energy sector." These assertions were addressed in great length at trial. Schaefers testified that he thought this information had been provided by him; Alexandrov testified that he obtained the information from Schaefers and placed it in the Presentation without independently investigating its veracity. Schaefers' curriculum vitae (CV), which was admitted at trial, included the heading "Entrepreneurial Activities," under which was the similar statement: "Energy and renewable energy investments since 1988."

Evidence presented at trial showed that from 1988 to 1992, Schaefers was an investor in Schick KG, a German R&D company involved in recycling carbon dioxide and in uses of algae. The carbon dioxide project was cancelled because of the German coal industry's reluctance to discuss publicly carbon dioxide emissions at that time, and the algae project "stalled" in 1992 when lead scientist Joseph Schick died. Thereafter, Schaefers was involved in "a city development project with the city of Cologne"; he owned a ski resort in Vermont; he tried to buy a movie studio; and he pursued various real estate opportunities. He testified at trial that none of these business ventures had anything to do with pyrolysis or converting tires to fuel.

From 2006 to the present, Schaefers was founder and CEO of BKS Energy, LLC (BKS), which pursued the conversion of algae to food and fuel. He acknowledged at trial that he had testified in a pretrial deposition that he had never made any money with BKS except from Blizzard, but he asserted that he had forgotten about a contract BKS had with

the city of Fresno "to enhance the gasses that would come out of the sewer system, and these gasses could be put into liquid fuels." Schaefers did not testify about a timeframe for the Fresno contract.

The next renewable energy project Schaefers became involved with was in 2005 or 2006, when he invested $3 million into Baskett's ultimately unsuccessful idea to build an ethanol plant in Santa Maria. Schaefers agreed at trial that "there was a 13-year gap between when [he] did the previous [renewable energy] project and when American Ethanol came up." Yet he also testified that he did not think that he ever told Shepard that he never had a business in the renewable energy sector, he never told her about the "15- or 13-year gap" in his involvement in renewable energy businesses, and he never told her that he had never made money in the renewable energy sector.

For her part, Shepard testified that Schaefers had never told her that he had never made any money in the renewable energy sector, nor did he tell her that "there were great big gaps in time in the instances where he actually did something in the renewable energy sector." Shepard also testified that when she received the Presentation, she understood that Defendants were presenting her with the information in the hopes that she would invest and provide capital for the pyrolysis project. In deciding to invest, she relied on the representations in the Presentation. When asked at trial whether "knowing what you know now about the defendants and what the project was and stuff, would you have invested with them," Shepard answered, "Absolutely not, and I regret that I didn't do a better job possibly in checking Mr. Schaefers' background."

Although Defendants argue on appeal that, as an experienced businesswoman, Shepard should have investigated their assertions and claims before relying on them, this court has long recognized:

""""A recipient of a fraudulent misrepresentation is justified in relying upon its truth without investigation, unless [she] knows or has reason to know of facts which make [her] reliance unreasonable" . . . [T]he test is whether the recipient has "information which would serve as a danger signal and a red light to any normal person of [her] intelligence and experience."' [Citations omitted.]" *Sippy v. Cristich*, 4 Kan. App. 2d 511, 515, 609 P.2d 204 (1980).

When considered in the light most favorable to Plaintiffs and with all reasonable inferences drawn in their favor, substantial evidence presented at trial supports a conclusion that the representation that Schaefers was a "veteran entrepreneur with 20 years of expertise in the renewable energy sector" was untrue. Further, Schaefers' knowledge of his own entrepreneurial and work history, as well as Alexandrov and Gitman's failure to in any way investigate the veracity of the representation, support the conclusion that Defendants knew the representation was false or recklessly disregarded that possibility. The representation was intentionally made in a presentation specifically designed to solicit investments. Shepard justifiably relied on the representation about Schaefers' experience in the renewable energy sector. She testified that Schaefers' representation, in part, caused her to invest; she testified that she would not have invested if she had known the truth about Schaefers' experience; and the evidence supported a finding that Shepard sustained damage by investing, as she submitted receipts and invoices to the jury showing the expenses she incurred by investing in the project. We conclude there was sufficient evidence to sustain a fraud claim against the Defendants.

### WAS THERE SUFFICIENT EVIDENCE TO SHOW THAT GITMAN PERSONALLY COMMITTED FRAUD?

Defendants also contend that there was insufficient evidence to support a finding that Gitman personally committed fraud, pointing to evidence supporting the conclusion that he never communicated directly with Shepard. Plaintiffs respond that the evidence

22

shows that Shepard communicated with Gitman extensively, albeit mostly through interpreters, and that there was sufficient evidence to support the jury's verdict.

As already set forth above:

> "'When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of the appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal.' [Citations omitted.]" *Wolfe Electric,* 293 Kan. at 407.

A claim of fraud "'must be established by clear and convincing evidence." *Bank of America*, 46 Kan. App. 2d at 158. "'The elements of fraud are "an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment."'" *In re Marriage of Kidane and Araya*, 53 Kan. App. 2d at 346.

Defendants claim that the evidence showed that Gitman never made any statements to Shepard directly, so he could not have committed fraud. They base their argument on Shepard's trial testimony that she "did not know that [Gitman] spoke English." Twice during the Russia trip, she "said good morning and how are you, and he just stood there. [And] when there was a question, he always referred to Mr. Alexandrov, and he did all the translation." Shepard also testified: "I never talked to Mr. Gitman because I didn't know that he spoke English, and he never spoke in English with me, and he said he told me all those things. I never had a conversation with the man."

Defendants' reliance on this testimony is fatally undermined by Gitman's own testimony at trial to the opposite. Gitman testified that he had been surprised by Shepard's testimony that she did not know he spoke English, as they had "spoke[n] a lot and [they]

23

had a lot of like social conversations." He referred to a conversation he had at a restaurant in Great Bend during which Shepard heard him speaking English. He also described a Skype conversation involving Shepard during which he "pitch[ed]" some technology ideas, and he testified that he had spoken with Shepard "[f]rom the very beginning." The jury could have found Gitman more credible than Shepard on this point, and this court does not reweigh evidence or determine the credibility of witnesses. See *Wolfe Electric, Inc.*, 293 Kan. at 407.

Similarly, Defendants argue that the Presentation cannot sustain a fraud claim against Gitman because Gitman testified he looked at the financial information in the Presentation but didn't review it as "Alexandrov put it together." However, Gitman's testimony was that he did see the "pro formas that were put together by Mr. Alexandrov where he said here's how much we need to have, 3.75 million dollars" to fund the pyrolysis project. Thus, Gitman at the least tacitly approved of some information in the Presentation submitted to Shepard to solicit her investment. The jury could have concluded that Gitman's failure to review all of the Presentation, knowing that he was the holder of the implementing technology, constituted reckless disregard for the truth of the remainder of the Presentation.

Moreover, a deposition of Gitman dated December 29, 2009, taken as part of a separate lawsuit in the United States District Court for the Southern District of Florida, was admitted into evidence and submitted to the jury. In that deposition, Gitman explained that he knew Bob Miller, who he described as trying "to convert solid waste to gas and electricity. And one of the main source[s] of raw materials for them was used tires. So they were trying to de-composite [*sic*] used tires to produce fuels and electricity from used tires." Gitman explained that this idea was "not economically visible or viable" for "ecological issue[s]. When you convert used tires, you have to emit a lot of bad stuff in the atmosphere."

24

Later, in the same deposition, Gitman was questioned about another plant he had discussed with a man named David Whetsell in South Carolina: "The plant in South Carolina was going to use tires as its fuel source; correct?" Gitman replied:

> "No. We wanted to do algae system. Tires it is Waste to Energy—it is impossible in this country. You know how long it would take to get permits in Dade County? . . . Just to get first reply from [the Florida permitting authority] would take eight months. First reply. Then you submit application for something like tire conversion system or what have you, so it's impossible."

At trial, Plaintiffs questioned Gitman about this prior deposition testimony. Gitman asserted that the statement "was taken out of context" and that he "remembered [that plant] doing something with tires, but it was burning, not pyrolysis." He maintained that the 2009 deposition referred to burning tires, not the pyrolysis process pitched to Shepard. Yet also submitted to the jury here was a transcript of a hearing in the Florida federal litigation at which Robert Miller testified that he had spoken with Gitman about pyrolysis but did not pursue pyrolysis at that time. A reading of this evidence could lead to a reasonable conclusion that Gitman believed in 2009 that converting waste tires to energy was "impossible" in the United States, for both permitting and ecological reasons. This belief could support a reasonable conclusion that it was fraudulent for Gitman to tell Shepard in 2011 that the same process was viable and would likely be profitable.

When considered in the light most favorable to Plaintiffs and with all reasonable inferences drawn in their favor, the evidence presented at trial supports a conclusion that Gitman—directly or indirectly—made fraudulent representations to Shepard that she justifiably relied on to her detriment when investing in the Project. We conclude there was sufficient evidence to support a fraud claim against Gitman.

25

Next, Defendants argue that the jury rendered inconsistent verdicts which require dismissal of the finding that they committed fraud. Plaintiffs argue first that Defendants have not preserved this question for appeal because the parties agreed on the wording of the verdict form. Turning to the merits of the issue, they then contend that the jury's answers on the verdict form are not inconsistent, when considered in light of the entirety of the instructions the district court gave the jury.

*Preservation*

Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 35) requires appellants to begin each issue in their appellate briefs with "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court." Kansas appellate courts have repeatedly held that parties who do not object in the district court to the verdict form may not raise the issue for the first time on appeal. See *Reda v. Lowe*, 185 Kan. 306, 314, 342 P.2d 172 (1959) (declining to address a challenge to the wording of a special question submitted to the jury "since the defendant did not object to special question No. 13 and must be deemed to have waived it . . . , nor was this point argued before the trial court on the defendant's motion for a new trial"); *Zenda Grain & Supply Co. v. Farmland Industries, Inc.*, 20 Kan. App. 2d 728, 757, 894 P.2d 881 (1995) (holding that the failure to object in the district court to a verdict form submitted to the jury "prevents an appellant from raising the issue to an appellate court").

Although Defendants filed an appellate brief addressing the issue raised in Plaintiffs' cross-appeal, they did not respond to Plaintiffs' argument that Defendants may not raise the inconsistent verdict argument on appeal because they failed to object to the verdict form in the district court. This court could consider Defendants' failure to respond

26

in their reply brief to Plaintiffs' preservation argument a concession of its validity and thus decline to address the merits of this issue for failure to comply with Supreme Court Rule 6.02(a)(5). See *State v. Bowen*, 299 Kan. 339, 355, 323 P.3d 853 (2014).

The appellate record reflects that the jury instruction conference included discussion of and proposed changes to the verdict form the district court intended to use, but there were no objections by either party to the wording of the portions relevant to Defendants' arguments on appeal. Moreover, the day after the jury instruction conference, when the district court asked Defendants whether they approved the jury instructions "as they're now being presented" in the form given to the jury shortly thereafter, Defendants asked questions about the claims of joint venture and unjust enrichment and did not refer to the portion of the verdict form now at issue. The record on appeal does not contain proposed jury instructions or a proposed verdict form submitted by Defendants, so this court cannot determine whether Defendants proposed the language they now assert led to the inconsistency in the verdict.

Although they did not respond directly to Plaintiffs' preservation argument in their reply brief, Defendants did argue in their initial brief that they are not challenging the verdict form itself, merely the inconsistency of the verdicts rendered, so there was no need to object to the verdict form in the district court. This argument is disingenuous at best. In any case, even if the issue is properly before this court, the answers on the verdict form were not inconsistent and do not require reversal.

*Merits*

K.S.A. 60-3702(c) states: "In any civil action where claims for exemplary or punitive damages are included, the plaintiff shall have the burden of proving, by clear and convincing evidence in the initial phase of the trial, that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." Moreover, K.S.A. 60-

27

3702(a) states: "In any civil action in which exemplary or punitive damages are recoverable, the trier of fact shall determine, concurrent with all other issues presented, whether such damages shall be allowed."

On the verdict form, the jury answered "yes" to question A(1)—"Do you find that Mr. Alexandrov, Mr. Gitman, and Mr. Schaefers committed fraudulent acts either by concealment or representation against Blizzard and Ms. Shepard?"—but answered "no" to question A(4)—"Do you find that the conduct of Mr. Alexandrov, Mr. Gitman, and Mr. Schaefers in committing fraudulent concealment or fraudulent representation was willful, fraudulent, or malicious?" Defendants argue that it was facially and fatally inconsistent for the jury to find in one section of the special verdict form that they had committed "fraudulent acts" but find in another section that the same conduct was not "fraudulent." Defendants' success on this issue depends on this court refusing to look beyond the plain language of the verdict form; however, the applicable standard of review requires otherwise.

> "A jury's findings on the essential issues submitted by way of special verdicts must be certain and definite. The findings must not be conflicting or inconsistent. The findings are to be construed in the light of the surrounding circumstances and in connection with the pleadings, instructions[,] and issues submitted. If the answers in respect to the controlling facts are inconsistent, a judgment should not be rendered but a new trial ordered. [Citation omitted.]" *Jenkins v. T.S.I. Holdings, Inc.*, 268 Kan. 623, 626-27, 1 P.3d 891 (2000).

In addition, "'[s]pecial findings of a jury are to be liberally construed on appeal and interpreted in the light of the testimony with the view of ascertaining their intended meaning.'" *Calver v. Hinson*, 267 Kan. 369, 375, 982 P.2d 970 (1999). "'[I]f one interpretation leads to inconsistency and another to harmony with the verdict, the latter is to be adopted.'" 267 Kan. at 376.

28

As Plaintiffs argue on appeal, one reasonable interpretation of question A(4) on the verdict form was that it was intended to inquire about punitive damages. First, the district court instructed the jury orally and in writing about the punitive damages claim, and the court did so distinctly and separately from the elements instructions. After the elements instructions, the district court instructed:

> "In this case, Blizzard and Ms. Shepard claim that Mr. Alexandrov, Mr. Gitman, and Mr. Schaefers acted in a willful, fraudulent and/or malicious manner toward Blizzard and Ms. Shepard. . . . If you award Blizzard and Ms. Shepard actual (compensatory) damages as part of these claims, then you may consider whether punitive damages should be allowed. Punitive damages may be allowed in the jury's discretion to punish a . . . responsible party and to deter others from like conduct.
> "In order for punitive damages to be awarded, Blizzard and Ms. Shepard must prove by clear and convincing evidence that Mr. Alexandrov, Mr. Gitman, and Mr. Schaefers acted in a willful, wanton, fraudulent, and/or malicious manner toward Blizzard and Ms. Shepard. . . .
> "If you determine punitive damages should be allowed, your finding must be entered on the verdict form."

A separate jury instruction also stated that "Blizzard and Ms. Shepard are seeking punitive damages for Defendants' willful, wanton, fraudulent, or malicious conduct." Thus, the jury instructions communicated to the jury that the question of "willful, wanton, fraudulent, or malicious conduct" was relevant to the determination on punitive damages. The verdict form itself reinforced that concept.

Question A(1) on the verdict form asked the jury whether it found that Defendants "committed fraudulent acts either by concealment or representation against" Plaintiffs. If the answer was "yes," the verdict form instructed the jury to go to question A(2), which asked whether Plaintiffs "sustained damages as the proximate result of the fraudulent concealment, or fraudulent representation, by" Defendants. If the answer was "yes," the verdict form instructed the jury to calculate actual damages in question A(3) and then, in

29

question A(4), asked: "Do you find that the conduct of [Defendants] in committing fraudulent concealment or fraudulent representation was willful, fraudulent, or malicious?"

When considered in light of the jury instructions, it is a reasonable interpretation that questions A(1), A(2), and A(3) went to whether Plaintiffs had proved the elements of fraud, while question A(4) went to punitive damages, which the jury had been instructed it had the discretion to award or to not award. Had the jury answered "yes" to question A(4), the trial would have proceeded to a phase in which the amount of punitive damages would be determined. By answering "no," the jury showed that it found punitive damages should not be awarded, a decision within its discretion. Under this interpretation, the answers to questions A(1) and A(4) on the verdict form were not inconsistent.

Moreover, to the extent that Defendants contend that a finding of fraud automatically entitles a party to punitive damages because fraud necessarily requires fraudulent conduct, this court has long rejected the concept of automatic entitlement to punitive damages. In *Trendel v. Rogers*, 24 Kan. App. 2d 938, 941, 955 P.2d 150 (1998), this court held:

> "[T]he clear language of the statute [states] that it is the role of the trier of fact to determine whether punitive damages should be allowed. . . . [T]here is no indication . . . that the legislature intended for punitive damages to be automatically awarded once the jury finds the defendant acted willfully, wantonly, or with fraud or malice."

The *Trendel* court continued by noting the "general rule [that] the jury has complete discretion in awarding punitive damages and may disregard evidence presented in favor of such an award." 24 Kan. App. 2d at 941. Stated another way:

> "[P]unitive damages may be awarded whenever the elements of fraud . . . arise in a dispute. However, such an award is not automatically rendered by finding these elements

30

present in a controversy. The plain language of 60-3702 reveals the legislature intended for the trier of fact to have discretion in determining whether punitive damages should be allowed." 44 Kan. App. 2d at 942.

When the verdict form is considered in the context of the jury instructions, the answers to questions A(1) and A(4) are not necessarily inconsistent because the finding of fraudulent conduct in question A(1) did not require the jury to award punitive damages in question A(4). Rather, for the reasons explained above, the verdicts were consistent.

### DID THE DISTRICT COURT ERR BY DISMISSING THE PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM?

As cross-appellants, Shepard and Blizzard argue that the district court erred by granting the Defendants' motion to dismiss the claim against them for negligent misrepresentation. However, they request relief—the reinstatement of their claim for negligent misrepresentation—only "[i]n the event that the Court grants Defendants a new trial." Because Defendants are not entitled to a new trial, as explained above, the cross-appeal is moot. See *Rodarte v. Kansas Dept. of Transportation*, 30 Kan. App. 2d 172, 182-83, 39 P.3d 675 (2002). "'The court is statutorily and constitutionally without authority to render advisory opinions in cases found to be moot.'" 30 Kan. App. 2d at 183. Thus, we dismiss the cross-appeal as moot.

Affirm in part and dismissed in part.